1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SPOTTERRF LLC, | Case No. 3:24-cv-05994 |
| Plaintiff, | |
| | ORDER GRANTING IN PART AND |
| v. | DENYING IN PART DEFENDANTS' |
| | MOTION TO DISMISS |
| EDWARD KNOCH; MERRITT RYSAVY; | |
| THE KNOCH GROUP LLC; JON | |
| MANDRELL; SECURE SENSE | |
| INNOVATIONS INC, | |
| Defendant. | |

## I.    INTRODUCTION

This case involves a dispute between a company and three of its former employees and contractors, whom the company alleges breached various contractual and fiduciary duties as well as state and federal law to unlawfully compete with its established business. Plaintiff SpotterRF LLC ("Spotter") filed this lawsuit on December 5, 2024 against Defendants Edward Knoch, Merritt Rysavy, Jon Mandrell, The Knoch Group, LLC ("TKG"), and Secure Sense Innovations Inc ("SSI") (collectively "Defendants"). Dkt. 1. Spotter advances ten claims, including breach of contract, breach of the implied duties of good faith and fair dealing and loyalty, intentional

interference with contractual relationships, and violations of the Uniform Trade Secrets Act ("UTSA") and the Defend Trade Secrets Act of 2016 ("DTSA"). *Id.* ¶¶ 153–213. Before the Court is Defendants' partial motion to dismiss for failure to state a claim. Dkt. 12; Fed. R. Civ. P. 12(b)(6). Having reviewed the parties' pleadings and briefs, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss.

## II.     BACKGROUND

### A.     SpotterRF and Edward Knoch

Spotter, a Utah-based company, was founded in 2009 to develop and manufacture Compact Surveillance Radar ("CSR") systems for "perimeter, ground, air, sea[,] and drone detection." Dkt. 1 ¶¶ 1, 12–13. Spotter initially developed its CSR technology for military use, but since 2013 has expanded its application to various commercial industries and settings, including airports, bridges, businesses, farms, construction sites, dams, oil wells, prisons, and residential properties. *Id.* ¶¶ 12, 14–15.

Spotter hired Knoch in April 2018. *Id.* ¶ 23. By July 2018, Knoch was employed full-time at Spotter, initially working as the company's Director of Business Development for the Atlantic regions. *Id.* ¶ 25; Dkt. 12 at 3. Spotter and Knoch executed an employment agreement, which included several restrictive covenants. *See generally* Dkt. 1 at 25, 44–50. First, the agreement included a "Covenant Not to Compete" that defined the "time, geographic, and scope limitations of [Knoch's] obligations[.]" *Id.* at 46–47. Relevant here, the noncompete provision required that Knoch:

> . . . agree that during the course of relationship with the Company and for 24 months following the termination of my relationship with the Company (the "*Noncompetition Period* ") for any reason, I will not . . . (i) serve as a partner, employee, consultant, officer, director, manager, agent, associate, investor, or (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate myself with any business, (a) in

competition with or otherwise similar, including radar of any type even if not in direct competition to the Company's business at the time my relationship with the Company terminated or (b) competing in any other line of business that I knew or had reason to know the Company had formed an intention to enter.

*Id.* at 46. The noncompete provision also included a severability clause:

If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event the provisions of subsection (a) are deemed to exceed the time, geographic or scope limitations permitted by law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by law.

*Id.* at 47. Second, the employment agreement included a confidentiality provision defining the "Confidential Information" Knoch was prohibited from disclosing:

I agree at all times during the term of my relationship with the Company and thereafter, to hold in strictest confidence, and not to use, except for the exclusive benefit of the Company, or to disclose to any person, firm or entity without written authorization of an authorized officer of the Company, any Confidential Information of the Company. I understand that "*Confidential Information*" means any nonpublic information that relates to the actual or anticipated business or research and development of the Company, Company proprietary information, technical data, trade secrets or knowhow, including, but not limited to, research plans, research results, processes, methods, compositions, business plans, marketing plans, product plans, products, services, suppliers, customer lists and customers (including, but not limited to, customers of the Company on whom I call or with whom I become acquainted during the term of my service on behalf of the Company), markets, software, specifications, inventions, operations, procedures, compilations of data, technology, designs, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation. I further understand that Confidential Information does not include any of the foregoing items that has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved[.]

*Id.* at 44. Third, the employment agreement included a nonsolicitation provision:

I agree that for a period of 12 months immediately following the termination of my relationship with the Company for any reason, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, either for myself or for any other person or entity.

*Id.* at 46. Fourth, the agreement contained a "Non-Disparagement/Defamation" provision:

> The employee agrees that during the term of this agreement and after the termination of employment, the employee shall not to [*sic*] disparage or defame SpotterRF in any respect or to make any derogatory comments, whether written or oral, regarding SpotterRF or its current or former officers, directors, employees, attorneys, agents, or contracting parties, or its business or operations.

*Id.* at 47.

Finally, the employment agreement defined how it would interact with any future contracts Knoch would sign with Spotter, controlling in the event of a conflict:

> In the event of any direct conflict between any term of this Agreement and any term of any other agreement executed by me, the terms of this Agreement shall control. If I signed or sign any other agreement(s) relating to or arising from my relationship with the Company, all provisions of such agreement(s) that do not directly conflict with a provision of this Agreement shall not be affected, modified or superseded by this Agreement, but rather shall remain fully enforceable according to their terms.

*Id.* at 48–49.

On January 29, 2019, Knoch "threatened to resign from Spotter if certain specific demands . . . were not met." *Id.* ¶ 29. Knoch sent an email containing the requests necessary for him "to consider staying," asking Spotter to review "this list with the goal of seeing how we can continue to directly partner with each other." *Id.* ¶ 30. In the same email, Knoch wrote, "'**I have submitted to Brad my resignation (verbally) yesterday and consider that (1/28/2019) the beginning of my last two weeks of employ with SpotterRF prior to my departure <u>Unless</u> we can come to the terms in the attached note.**'" *Id.* ¶ 32 (emphasis in original). Knoch continued, writing, "**[a]s that was a verbal resignation, please consider this my formal resignation (once again pending review of my requirements for potentially staying at Spotter) effective the 28th of January, 2019.**" *Id.* (emphasis in original).

Spotter responded, and on January 30, 2019, Knoch rejected Spotter's initial offer and "emailed Spotter's upper management with a subject line of 'Final Thoughts,' which contained a

counteroffer for Knoch to continue working with Spotter.'" *Id.* ¶¶ 34–35. Knoch explained that

he "expect[ed] to get a 'new' offer letter" from Spotter and that he "anticipate[d] that we (Brad

and I) will (in quick order) start the process of planning and execution to deal with short /

medium and long-term goals." *Id.* ¶ 36. Knoch concluded the email by writing, "I will either sign

your letter today (as defined in the attached document) OR I will sign my offer letter for Jemez."

*Id.* Spotter sent Knoch an updated offer letter, which Knoch signed the next day. *Id.* ¶ 37; *see*

*generally id.* at 52–56. Spotter alleges that "Knoch continued his employment after his

conditional resignation date[.]" *Id.* ¶ 39.

The offer letter described Knoch's new position and responsibilities as Spotter's Director

of Sales for the Pacific NW and Canada, as well as changes to his compensation and benefits. *Id.*

at 52–55. As relevant here, the offer letter included a "Covenant Not to Compete" and a

"Confidentiality Agreement." *Id.* at 55–56.

The language of the noncompete provision is substantially the same as the one in

Knoch's July 2018 employment agreement, with one exception: the January 2019 offer letter

amends the length of the noncompete covenant to 12 months after separation from Spotter.

*Compare id. with id.* at 46–47.

The confidentiality agreement in the offer letter provides significantly less detail than the

provision in the July 2018 employment agreement. *Compare id.* at 55 *with id.* at 44–45. It states

that, "You will maintain in confidence, during and subsequent to your employment, any

information about SpotterRF or its affiliates that is confidential or which might reasonably be

expected to be regarded by SpotterRF or its affiliates as confidential, and you will not use that

information except for the benefit of SpotterRF or its affiliates." *Id.* at 55.

The "Confidentiality Agreement" section concludes by stating: "Upon acceptance of this

position, you will be expected to execute an Employee Agreement. Enclosed is a copy of the

Employee Agreement for your review." *Id.* Spotter alleges that though "[t]he offer referenced an additional more comprehensive employment agreement tha[t] is given to new hires," it "was not included with the offer letter because Knoch had previously executed an employment agreement with Spotter." *Id.* ¶ 38. Elsewhere in the January 2019 offer letter, Spotter states that "[t]his offer of employment is conditioned upon the satisfactory completion of certain requirements, as more fully explained in the following." *Id.* at 52. The only explicit requirement mentioned in the offer letter is on the last page where Knoch is instructed to sign and return the offer letter "within three (3) days of [Knoch's] receipt which represents the length of validity of this offer." *Id.* at 56.

Finally, the offer letter included an "Employment At Will Doctrine" provision, stating:

> This letter is simply a summary of the Company's offer of employment to you, provided to you for your convenience, and shall not constitute or be deemed, in any manner whatsoever, a contract of employment. If you join the Company on the basis [*sic*] on the foregoing offer of employment, you will be employed "*at will*", which means that either you or the Company may terminate the employment relationship at any time, for any reason, with or without notice.

*Id.*

Knoch moved to Battleground, Washington in November 2020, continuing to work for Spotter from his home office. *Id.* ¶ 41. In late 2021, Knoch was promoted to "Director of Services." *Id.* ¶ 42. As part of his responsibilities, "Knoch received access to Spotter's confidential information, was trained in site design and commissioning, supervised some of Spotter's employees, was involved in the development and implementation of many Spotter products and services, and had direct contact with Spotter's important clients and prospective clients." *Id.* ¶ 50. Among the products Knoch was "directly involved in" was the "development of software for Spotter, including the implementation" of features for Spotter's NetworkedIO system. *Id.* ¶ 47. NetworkedIO is a "sensor management system that uses machine learning and Artificial Intelligence . . . for the automatic classification of targets." *Id.* ¶ 48. Sensor

management systems are referred to in the industry as "Command and Control" systems or "C2." *Id.* NetworkedIO is Spotter's C2. *Id.* Spotter alleges that it "has invested millions of dollars in the development of NetworkedIO." *Id.*

Beginning in 2022, "Spotter was working directly with an individual named Kyle Meloney, the co-founder and CEO" of Walaris, "towards a collaboration in the industry." *Id.* ¶ 55. Walaris is a "direct competitor of Spotter," whose business includes video analytics/video AI. *Id.* ¶¶ 55, 62. Spotter was also developing its own video analytics/video AI at the time, of which Knoch was aware. *Id.* Walaris and Spotter executed a Mutual Non-Disclosure Agreement ("MNDA") on June 22, 2022, of which Knoch was also aware. *Id.* ¶ 56.

Around July 2022, "Knoch began lashing out at Spotter executives for no apparent reason," later "attribut[ing] his behavior to COVID-19." *Id.* ¶ 58. As a result, Knoch took three weeks of paid time off starting "on or about July 14, 2022." *Id.* Knoch was introduced to Meloney on July 14, 2022 via a meeting and demonstration arranged by another Spotter employee, John Hunsucker. *Id.* ¶ 57. A week later, Hunsucker arranged for Knoch to meet with Meloney face-to-face. *Id.* ¶ 60. Spotter alleges the meeting "was not intended to promote Spotter's business, products or services," *id.*, and that Knoch and Meloney "developed a plan to promote and sell [Walaris] without Spotter's involvement," *id.* ¶ 61. "Shortly after the meeting was arranged, Spotter's exploratory relationship with [Walaris] ceased." *Id.*

On September 10, 2022, Knoch gave written notice that he would resign his position with Spotter at the end of the month, though he intended to take "a leave of absence for the week of the 12th of September to attend GSX," a large trade show, as "an independent participant." *Id.* ¶¶ 52, 63 (internal quotation marks omitted). Knoch's resignation letter "specifically confirmed his intention to continue working for Spotter" through the end of September, which he did, continuing to be paid by the company. *Id.* ¶ 54.

Knoch met with Meloney again on September 15 on the sidelines of GSX. *Id.* ¶ 63. Spotter alleges the meeting was "not within the course and scope" of Knoch's employment with Spotter based on there being no record of the meeting on its scheduling system or any emails following up on the meeting within its email system. *Id.* ¶ 64. According to a LinkedIn message in September 2022, the meeting was for the purpose of "moving forward on a potential relationship." *Id.* ¶ 65. The same month following the meeting, Meloney asked Knoch who he "should name in the MNDA[?]" *Id.* ¶ 66. Knoch replied that "[t]he company name is TKG-Security," and told him the best email to send the MNDA to was his "new one – edward.knoch@thekgrp.com." *Id.*

Prior to his meeting with Meloney at GSX, Knoch downloaded a "[c]onfidential and [p]roprietary" document entitled "Project Design Proposal," which Knoch "had no reason related to his work at Spotter to access and download[.]" *Id.* ¶ 69. Spotter further alleges that based on a preliminary investigation, "Knoch moved, copied, and deleted numerous proprietary files from his computer to his personal device or a TKG device." *Id.* ¶ 70.

After his Spotter employment ended, Knoch "retained an Amazon Machine Instance ("AMI") which contained the entire software components that make up Spotter's NetworkedIO without any authorization from Spotter to take the AMI." *Id.* ¶ 71. On October 7, 2022, Knoch "offered to provide Spotter's most expensive and innovative radar to Walaris for integration with Walaris's system" without Spotter's consent. *Id.* ¶ 73. Further, on November 18, 2022, "Knoch offered to leave his [Spotter] 'demo kit' with Walaris to allow them to 'get tracks sent into the AirScout Verify platform directly from Spotter Software.'" *Id.* ¶ 76. AirScout is advertised by Walaris as a system that "protect[s] sensitive locations across the globe, including bases, borders, government facilities, critical infrastructure, sports stadiums, and more." *Id.* ¶ 62. Spotter asserts

1   that Knoch "had not purchased any software from Spotter for his individual use and, [even] if he

2   had, [his proposed use] would violate . . . Spotter's end user license agreement[.]" *Id.* ¶ 76.

3       Around this time, Spotter also alleges that Knoch disparaged Spotter to Walaris in

4   violation of his non-disparagement agreement. *See id.* ¶ 116. On November 17, 2022, Knoch

5   emailed Walaris stating, "Given the somewhat tenuous nature of the company in Utah, they tend

6   to get very focused on finding conspiracies wherever they can." *Id.*

**B. Merritt Rysavy**

8       Spotter hired Rysavy in January 2021 for a position on Knoch's team. *Id.* ¶ 122. Rysavy

9   signed his employment agreement on January 8, 2021. *Id.* at 80. Rysavy's first day at Spotter

10  was January 25, 2021. *Id.* ¶ 122. A day later, Rysavy was "provided an older form of

11  employment agreement in error that he likewise signed and returned." *Id.*; Dkt. 14-1. Spotter

12  states that "there was no change in job position, job duties, compensation or other consideration

13  in support of a change to the [January 8] employment agreement." Dkt. 1 ¶ 122.

14      The primary difference between the January 8 and January 21 contracts is the length of

15  the noncompete provision. While the earlier contract included a 12-month noncompete

16  provision, *id.* at 75, Rysavy's later contract contained a 24-month noncompetition covenant,

17  Dkt. 14-1 at 4. As relevant here, Rysavy's later contract included the same confidentiality,

18  solicitation, and non-disparagement/defamation terms and conditions as Knoch's 2018

19  employment agreement. *See id.* at 2–5; Dkt. 1 at 44, 46, 47. Like Knoch's 2018 employment

20  agreement, Rysavy's later January 25 agreement included language that its terms control in the

21  event of a conflict. *See* Dkt. 14-1 at 6–7.

22      Following Knoch's departure, Rysavy "assumed roles and responsibilities previously

23  held by Knoch which included oversight of the services and support department and project

24  management of a large utilities project." *Id.* ¶ 131. Spotter asserts that "[g]iven the opportunity

for further investigation and discovery, Spotter will likely have evidence that Rysavy was present during Knoch's meeting with Meloney at GSX" and "that both Rysavy and Knoch took substantial actions to compete with Spotter." *Id.* ¶ 132. Spotter also alleges that, "[g]iven the opportunity for further investigation and discovery, Spotter will likely have evidence that Rysavy assisted or otherwise provided aid and support to Knoch and TKG on a project located in Columbia, South Carolina in the Fall of 2022." *Id.* ¶ 134.

Between November and December 2022, Spotter and Rysavy negotiated a position change, which included a salary increase and bonus. *Id.* ¶ 135. After Spotter sent the new offer letter but before he accepted, Rysavy "intentionally accessed and downloaded all versions of NetworkedIO from version 4.2 through 5.1" and "NetworkedIO ISO files for creating new NetworkedIO servers." *Id.* ¶ 137; *see also id.* ¶¶ 136, 138. Rysavy downloaded "multiple versions of the NetworkedIO Reference Guide in English and Spanish which details how to configure NetworkedIO." *Id.* ¶ 137. The downloading occurred multiple times over a three-day period in December to at least 3 different IP addresses. *Id.* Although Rysavy had access to these files as part of his position at the company, Spotter attests that "[t]he only files that would have been useful in the course and scope of his duties at the time" was the latest version of NetworkedIO. *Id.*

Rysavy accepted the new position on December 19, 2022 and received the bonus soon after. *Id.* ¶ 138. On December 23, 2022, Rysavy told Spotter he intended to resign and that his last day at the company would be January 6, 2023. *Id.* ¶ 139. Spotter alleges that by January 17, 2023, "Rysavy was working for TKG, had been assigned a TKG company email address, and was included in communications with Walaris regarding mechanical engineering issues as well as communications regarding TKG building a C2." *Id.* ¶ 144.

Spotter alleges that Knoch "solicit[ed] at least two employees to leave Spotter" in violation of his nonsolicitation agreement, including Rysavy. *Id.* ¶ 110. Spotter asserts that "[g]iven the opportunity for further investigation and discovery Spotter will likely have evidence that in or around December 2022, Knoch orchestrated the hiring" of Rysavy by InterWest Technology Group, Inc. *Id.* ¶ 111. At the time of Rysavy's employment with InterWest, InterWest's manager and owner was also the principal investor and CEO of TKG. *Id.*

In addition to Rysavy, Spotter alleges that Knoch "approached multiple Spotter employees" at a March 2023 trade show "saying he could help them get job offers from Echodyne," a Spotter competitor. *Id.* ¶ 112. "Knoch texted a current Spotter employee, Ken Gardner, and asked him if another then-current Spotter employee, Anna Kim, 'would . . . be interested starting as inside sales with a track to becoming outside sales[.]'" *Id.* ¶ 113. Knoch later met up with Gardner and Kim at a bar, and Kim left with Knoch to an Echodyne event. *Id.* "Shortly thereafter, Anna Kim resigned from Spotter and began working for Echodyne[.]" *Id.* ¶ 114. Spotter further alleges that "[g]iven the opportunity for further investigation and discovery, Spotter will likely have evidence that Rysavy encouraged Anna Kim to leave" Spotter "by making disparaging and derogatory comments" about the company. *Id.* ¶ 152.

## C.    Jon Mandrell

Spotter hired and employed Jon Mandrell as a software manager from September 2019 until March 2022. *Id.* ¶ 90. While employed by Spotter, Mandrell was involved in the development and deployment of NetworkedIO. *Id.* ¶ 90. At the end of his full-time tenure at Spotter, Mandrell signed an agreement to work as an independent contractor on Spotter's software team beginning on April 27, 2022 until January 26, 2023 *Id.* ¶¶ 92, 94; *see id.* at 58–68. Mandrell's independent contractor agreement included terms and conditions related to

"Confidential Information" and "Proprietary Information." *Id.* at 61–63. The agreement also contained a "Mediation and Arbitration" clause, which provided that:

> "[A]ll controversies, disputes, and/or actions related to this Agreement . . . shall be resolved by submitting the matter to non-binding mediation . . . . If the parties are unable to resolve the matter through mediation, any party may submit the same to binding arbitration[.]"

*Id.* at 66.

At the conclusion of Mandrell's contracting work, Spotter alleges that he and Knoch began working "on a C2 platform that competes with Spotter's NetworkedIO." *Id.* ¶ 95. On November 17, 2023, Mandrell and Knoch formed Secure Sense Innovations Inc. ("SSI"). *Id.* ¶ 98. Mandrell serves as the president of SSI, and Knoch serves as its secretary. *Id.* Soon after its formation, SSI applied for trademark protection for "CoreCommand," SSI's C2 that is "competitive with Spotter's NetworkedIO." *Id.* ¶¶ 99, 103. Spotter alleges that "[g]iven the opportunity for further investigation and discovery, Spotter will likely have evidence that Knoch, Rysavy, and Mandrell downloaded and used Spotter's confidential and proprietary intellectual property including NetworkedIO . . . to develop CoreCommand and other TKG software products without authorization from Spotter." *Id.* ¶ 103.

## D.    Procedural history

On December 5, 2024, Spotter filed a complaint against Defendants, advancing ten causes of action. Dkt. 1. Spotter alleges breach of contract against Knoch, Rysavy, and Mandrell (Causes One, Seven, and Ten). *Id.* ¶¶ 153–57; 195–99; 209–13. Spotter asserts breach of the implied duties of good faith and fair dealing and loyalty against Knoch (Causes Two and Three) and Rysavy (Causes Eight and Nine) and intentional interference with contractual relationships against both Knoch and Rysavy (Cause Five). *Id.* ¶¶ 158–66; 181–84; 195–208. Finally, Spotter

alleges violations of the UTSA and DTSA against all Defendants (Causes Four and Six). *Id.* ¶¶ 167–80; 185–94.

On January 16, 2025, Defendants moved the Court to dismiss the complaint in part. Dkt. 12. Spotter responded on February 20, 2025, Dkt. 17, and Defendants replied on March 6, 2025, Dkt. 18. Having reviewed the parties' pleadings and briefs, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) motions may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citation omitted). To survive a Rule 12(b)(6) motion, the complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

The Court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party," *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014), but need not "accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555. "[A] plaintiff's

obligation to provide the grounds of his entitlement to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555 (internal quotation marks omitted). "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*,

556 U.S. at 678.

Finally, in a case alleging the same claims against multiple defendants, there must be

specific allegations explaining what each defendant allegedly did wrong, rather than general

allegations asserted against them as a group. *Trusov v. Oregon Health & Sci. Univ.*, No. 3:23-

CV-77-SI, 2023 WL 6147251, at *2 (D. Or. Sept. 20, 2023); *see In re Nexus 6P Prod. Liab.

Litig.*, 293 F. Supp. 3d 888, 908 (N.D. Cal. 2018) ("Plaintiffs must identify what action each

Defendant took that caused Plaintiffs' harm, without resort to generalized allegations against

Defendants as a whole.") (citation modified).

## IV.    JURISDICTION AND GOVERNING LAW

Before addressing the motion's merits, the Court must confirm that it has subject matter

jurisdiction over the parties' claims. *See United Invs. Life Ins. Co. v. Waddell & Reed Inc.*, 360

F.3d 960, 966–67 (9th Cir. 2004) ("[A] district court's duty to establish subject matter

jurisdiction is not contingent upon the parties' arguments. . . ." and it generally has an obligation

to establish subject matter jurisdiction "*sua sponte*, whether the parties raised the issue or not").

The Court has federal question jurisdiction over this action because Spotter asserts one or

more claims arising under federal law. 28 U.S.C. § 1331; Dkt. 1 ¶¶ 9; 185–194. The Court has

supplemental jurisdiction to hear Spotter's remaining claims because they arise from the same

set of facts as the federal claim. 28 U.S.C. § 1367; Dkt. 1 ¶ 10. Accordingly, the Court applies

federal procedural law and state substantive law to the state-law claims. *Hanna v. Plumer*, 380

U.S. 460, 465 (1965) ("The broad command of *Erie* was therefore identical to that of the Enabling Act: federal courts are to apply state substantive law and federal procedural law.").

The parties largely agree that Utah substantive law applies to this dispute. *See* Dkt. 12 at 10; Dkt. 17 at 5 n.1, 7. Defendants assert that Washington's statutory noncompetition protections, section 49.62 of the Revised Code of Washington ("RCW"), should apply where "applying the law of Utah would deprive a defendant of any of [its] protections[.]" Dkt. 12 at 10. As discussed below, because Defendants' noncompete agreements are void under Utah law, the Court need not address whether Washington law applies. *See infra* Sec.V.B.1. Accordingly, the Court analyzes Defendants' motion to dismiss under Utah law unless otherwise noted. *See infra* Sec. V.E.

## V.    DISCUSSION

The Court begins by determining the employee agreements that govern Knoch and Rysavy's relationship with Spotter during and after their Spotter employment. Based on the operative agreements, the Court then analyzes which of Spotter's breach of contract allegations state a claim for relief on the competition, solicitation, disparagement, and confidentiality provisions of their contracts. Next, the Court considers Defendants' motion to dismiss Spotter's claim that Knoch and Rysavy intentionally interfered with its contractual relationships. Then, the Court evaluates whether Spotter has sufficiently pled violations of the duty of good faith and fair dealing and duty of loyalty against Knoch and Rysavy. Finally, the Court considers Defendants' partial motion to dismiss Spotter's UTSA and DTSA claims against all Defendants.

Because the parties have agreed to mediate the UTSA, DTSA and breach of contract claims against Mandrell, Dkt. 17 at 6, the Court orders Spotter be compelled to pursue these claims by mediation, after which either party may submit the dispute to arbitration.

**A.     Employment agreements**

       *1.     Knoch*

Defendants first argue that Spotter's allegations of Knoch's breach of his 2018 employee agreement fail because Knoch resigned from Spotter in January 2019 before agreeing to a new role at the company. *See* Dkt. 12 at 12. Spotter attests that its emails with Knoch do not "indisputably confirm[] that he had resigned," pointing to Knoch's repeated conditional statements regarding his alleged resignation. Dkt. 17 at 8. The Court finds that, drawing all inferences in favor of Spotter, Spotter has sufficiently pled that Knoch did not resign. *See Retail Prop. Tr.*, 768 F.3d at 945 (explaining that courts must "draw all reasonable inferences in favor of the nonmoving party").

Knoch's language about resignation is equivocal and is plausibly read as a negotiating tactic. Although Knoch wrote in the January 29, 2019 email that he had "submitted . . . [his] resignation (verbally)," he qualified that his last two weeks would begin "[u]nless we can come to the terms in the attached note.'" Dkt. 1 ¶ 32 (emphasis removed). After stating in the same email to "consider this [his] formal resignation," Knoch immediately qualified that statement with another one clarifying "once again pending review of my requirements for potentially staying at Spotter." *Id.*

Knoch's statements in his January 30 email to Spotter further indicate that he did not resign. Knoch stated that he "expect[ed] to get a 'new' offer letter" from Spotter and if it met his expectations, he would immediately "'start the process of planning and execution to deal with short / medium and long-term goals.'" *Id.* ¶¶ 35–36. Finally, Spotter alleges that "Knoch continued his employment after his conditional resignation date[.]" *Id.* ¶ 39. Because the Court reasonably infers that Knoch was employed by Spotter throughout this period, Knoch's 2018 employment agreement remained in effect.

1    Next, the parties disagree on whether the January 30, 2019 offer letter is an enforceable

2    contract. *See* Dkt. 12 at 12; Dkt. 17 at 8–9. Defendants argue that the offer letter disclaims being

3    a "contract of employment." Dkt. 12 at 12 (citing Dkt. 1 at 56). Even if it was an offer of

4    employment, Defendants contend, the offer is conditioned on the execution of an employment

5    agreement, which Knoch never received or signed at the time. *Id.* Spotter argues that the

6    "contract of employment" language clarifies only that Knoch's employment was at-will. Dkt. 17

7    at 9. Spotter also asserts that the contract's only condition was that it be signed and returned

8    within a designated window, not that it required another future agreement. *Id.* Again, the Court

9    finds Spotter's allegations and arguments sufficient to survive a motion to dismiss.

10    When a court interprets a contract, it first looks at its plain language to determine the

11    parties' meaning and intent. *Brady v. Park*, 445 P.3d 395, 407 (Utah 2019). "If the language

12    within the four corners of the contract is unambiguous, the parties' intentions are determined

13    from the plain meaning of the contractual language, and the contract may be interpreted as a

14    matter of law." *Id.* (citation modified). "But where a contractual term or provision is ambiguous

15    as to what the parties intended, the question becomes a question of fact to be determined by the

16    fact-finder." *Id.* (citation modified).

17    The language purportedly disclaiming the January 2019 offer letter being a "contract for

18    employment" is located within a section entitled "Employment At Will Doctrine." Dkt. 1 at 56.

19    The intent of the language is further clarified in the second sentence of the provision: "If you join

20    the Company on the basis o[f] the foregoing offer of employment, you will be employed '*at*

21    *will*[.]'" *Id.* (emphasis in original). That the offer letter explicitly stated Knoch's employment

22    was at-will does not transform an otherwise enforceable agreement into an unenforceable

23    contract. *See Wride v. Wells Fargo Bank, N.A.*, No. 2:14CV00451-PMW, 2015 WL 5555735, at

24

*3 (D. Utah Sept. 18, 2015) (discussing that an offer letter that "states that it is *not* an employment contract" meant that the plaintiff's employment was at-will) (emphasis in original).

The offer letter is also not conditioned on Knoch signing a separate employment agreement. "A condition is an event, not certain to occur, which must occur before performance under a contract becomes due." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 367 P.3d 994, 1000 (Utah 2016) (citation modified). Conditions "typically fall outside the control of the parties to the contract often requiring some environmental trigger (such as 'weather permitting') or action by a third party (such as 'upon the lender's approval')." *Id.* (citation modified). And "express terms like 'unless,' 'on condition that,' 'provided that,' and 'if,' often create conditions." *Id.* (citation omitted). Defendants are correct that the offer letter states it is "conditioned upon the satisfactory completion of certain requirements, as more fully explained in the following." Dkt. 12 at 12 (citing Dkt. 1 at 52) (emphasis removed). But the language that "you will be *expected* to execute an Employment Agreement" contained within the offer letter's "Confidentiality Agreement" section neither states that it is a condition, nor is it indicative of conditionality. *See* Dkt. 1 at 55 (emphasis added); *Mind & Motion,* 367 P.3d at 1000. And as discussed above, Knoch's employment at Spotter was already governed by the existing 2018 employment agreement. *See* Dkt. 1 at 44–50; *id.* ¶ 38. Because the plain language of the offer letter suggests it is not conditioned on the execution of a future employment agreement, the 2019 offer letter signed by Knoch is an enforceable contract. *See* Dkt. 1 at 56.

Finally, the parties disagree on whether the 2019 offer letter, if enforceable, revises or replaces covenants contained in the 2018 employment agreement. *See* Dkt. 12 at 13–14; Dkt. 17 at 11. The Court returns to the contracts' plain language. *See Brady*, 445 P.3d at 407. The 2018 employment agreement states that "[i]n the event of any direct conflict between any term of this Agreement and any term of any other agreement executed by me, the terms of this Agreement

shall control." Dkt. 1 at 48. The 2018 employment agreement also provides that in the event of

other agreements signed by Knoch "arising from [his] relationship with the Company, all

provisions of such agreement(s) that do not directly conflict with a provision of this [2018]

Agreement shall not be affected, modified or superseded by this Agreement, but rather shall

remain fully enforceable according to their terms." *Id.* at 48–49. Accordingly, Knoch's

employment is governed by both agreements, but in the event of conflict, the 2018 employment

agreement controls. *See* Dkt. 1 at 48.

        2.   *Rysavy*

Defendants argue that the later January 25, 2021 employment agreement Rysavy signed

once he started working at Spotter—containing a 24-month noncompete covenant—replaced his

earlier January 8, 2021 agreement which included a 12-month noncompete. Dkt. 18 at 9. Spotter

responds that Rysavy's later contract cannot be considered on a motion to dismiss because it was

not attached or relied on in Spotter's complaint. Dkt. 17 at 15. Defendants are correct and

Rysavy's later contract controls.

Even though Spotter does not attach the later contract, Spotter relies on it in the

complaint. "As a general rule, a district court may not consider any material beyond the

pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688

(9th Cir. 2001) (citation modified).[1] But where a document is "not physically attached to the

complaint," it "may be considered if the document[']s[] authenticity is not contested and the

plaintiff's complaint necessarily relies on [it]." *Id.* (citation modified). Here, Spotter's complaint

directly references Rysavy's later contract. Dkt. 1 ¶ 122 ("After Rysavy's employment began, he

---

[1] *Lee v. City of Los Angeles* was abrogated on other grounds, as recognized in *Galbraith v. County of Santa Clara*, 307 F.3d 1110, 1126 (9th Cir. 2002). The Court does not rely on portions that have been abrogated.

was provided an older form of employment agreement in error that he likewise signed and returned."). And, although Spotter contends that "[t]he parties operated under the first employment agreement," it does not contest the second contract's authenticity. *See id.*; *Lee*, 250 F.3d at 688. Therefore, the Court can properly consider the later contract.

Based on the plain language of Rysavy's later contract and Utah law, Rysavy's later contract controls. Like Knoch's employment agreement, the later contract includes a provision that "[i]n the event of any direct conflict between any term of this Agreement and any term of any other agreement executed by me, the terms of this Agreement shall control." Dkt. 14-1 at 6; Dkt. 1 at 48. Spotter contends that the later contract did not govern Rysavy's employment because "there was no change in job position, job duties, compensation or other consideration" in exchange for a new agreement. Dkt. 17 at 4. But Utah courts have held that "an offer of continued employment for an otherwise terminable employee can constitute consideration[.]" *England Logistics, Inc. v. Kelle's Transp. Serv., LLC*, 559 P.3d 45, 54 (Utah Ct. App. 2024), *reh'g denied* (Nov. 5, 2024); *see also Sys. Concepts, Inc. v. Dixon*, 669 P.2d 421, 426 (Utah 1983) (affirming that an offer of continued employment is "adequate consideration"). Rysavy, like Knoch, was an at-will employee. Dkt. 14-1 at 6 ("I acknowledge that this relationship may be terminated at any time, with or without good cause or for any or no cause[.]"). Because Rysavy's continued employment at Spotter constituted consideration for a change in the terms governing his employment relationship, the later contract is enforceable. *See Sys. Concepts, Inc.* 669 P.2d at 426. Accordingly, the January 25 contract controls in the event of a conflict, including the 24-month term of Spotter's noncompete covenant. *See* Dkt. 14-1 at 6.

**B.    Breach of contract**

Defendants move to dismiss Spotter's breach of contract claims against Knoch and Rysavy (Causes One and Seven). Dkt. 12 at 13, 18–21; Dkt. 12-1 at 2. Spotter alleges several

theories supporting its breach of contract claims. Dkt. 1 ¶¶ 156, 198. The Court considers each of these theories as they apply to Knoch and Rysavy's operative employment agreements.

In Utah, "there are four elements to a breach of contract: (1) the existence of a valid and enforceable contract, (2) the plaintiff having performed its contractual obligations, (3) the defendant having breached the contract, and (4) the plaintiff having suffered damages." *Milestone Elec., Inc. v. Nice inContact, Inc.*, No. 2:20-CV-00630-TC-JCB, 2021 WL 5007707, at *2 (D. Utah Oct. 28, 2021).

### 1. Noncompetition

Spotter alleges that Knoch breached his contract by "creating a competing business called TKG Security in violation of his non-compete provision[.]" Dkt. 1 ¶ 156; *see also id.* (Knoch breached his contract by "siphoning and/or stealing actual, prospective or potential clients of Spotter . . . or assisting a direct competitor in doing so"). Spotter similarly asserts that Rysavy breached his contract by "coordinating, assisting, and generally working with Spotter's direct competitors, such as TKG, Walaris and Echodyne in violation of his non-compete provision[.]" *Id.* ¶ 198; *see also id.* (Rysavy breached his contract by "siphoning and/or stealing actual, prospective or potential clients of Spotter, or assisting a direct competitor in doing so").

The noncompete provisions in Knoch and Rysavy's operative employment agreements are plainly void under Utah law and cannot be reformed. In 2016, Utah passed the "Post-Employment Restrictions Act." Utah Code Ann. § 34-51-101 (West). The statute defines the permissible scope of an employer's noncompete provision:

> [F]or a post-employment restrictive covenant entered into on or after May 10, 2016, an employer and an employee may not enter into a post-employment restrictive covenant for a period of more than one year from the day on which the employee is no longer employed by the employer. A post-employment restrictive covenant that violates this subsection is void.

Utah Code Ann. § 34-51-202 (West).

Knoch's 2018 employment agreement contained a post-employment restrictive covenant with a term of 24 months. Dkt. 1 at 46. Knoch's 2019 offer letter included a similar noncompete provision for 12 months. *Id.* at 55–56. As discussed above, Knoch's 2018 employment agreement controls in the event of a direct conflict. *Id.* at 48; *see infra* Sec. V.A.1. Similarly, because Rysavy's later January 25, 2021 employment agreement controls over his earlier January 8 agreement, the operative term of Rysavy's noncompete provision is also 24 months. Dkt. 14-1 at 4, 6; *see infra* Sec. V.A.2. Thus, Spotter's noncompete covenants with Knoch and Rysavy violate Utah's Post-Employment Restrictions Act. *See* Utah Code Ann. § 34-51-202(1) (West).

Spotter argues that Knoch and Rysavy's noncompete covenants can be reformed under the "Severability" clauses in their respective agreements to a term "permitted by law." Dkt. 17 at 10–11 (citing Dkt. 1 at 47; Dkt. 14-1 at 5). But Utah's statute plainly states that an employer and employee "may not enter" a noncompete provision lasting more than one year and a "post-employment restrictive covenant that violates this subsection is void." Utah Code Ann. § 34-51-202(1) (West); *see Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 748 (Del. Ch. 2023), *aff'd in part, rev'd in part*, 332 A.3d 472 (Del. 2024) (concluding that a post-employment noncompete that lasts more than one year would be void when analyzed under Utah law). Further, allowing reformation of the noncompete provision would not only undermine this plain language, but also the intent of Utah's Post-Employment Restrictions Act. *See* Utah Code Ann. § 34-51-202(1) (West). If an employer could require its employees to agree to a noncompete provision that violates the statute, and only follow the law by reforming the contract if an employee challenged it, the deterrent effect of the statute would be lost. Accordingly, any breach of contract theory against Knoch and Rysavy based on their alleged violation of their noncompete provisions are dismissed.

2.    *Solicitation*

Spotter alleges that Knoch breached his contract by "soliciting Spotter employees as alleged in paragraphs 108–114[.]" Dkt. 1 ¶ 156. Spotter also asserts that Rysavy "solicit[ed] Spotter employees" in breach of his contract. *Id.* ¶ 198. Defendants argue that Spotter's one-year nonsolicitation provision is overbroad and therefore unenforceable as to Knoch and Rysavy. Dkt. 12 at 16, 18. Defendants specifically point to language in the provision that prohibited Knoch and Rysavy from "directly or indirectly. . . encourag[ing]" Spotter employees to "leave their employment" as an example of its overbreadth. *Id.* at 16 (citing Dkt. 1 at 46).

Spotter's solicitation agreement is not facially overbroad under Utah law. The Court acknowledges the limited case law in Utah evaluating the validity of employee solicitation agreements. *See* Dkt. 12 at 16 n.6. Even so, courts have upheld similar solicitation agreements under Utah law. For example, in *SecurityNational Motrgage Co. v. Chavez*, a Utah district court granted an employer's temporary restraining order based on allegations in its complaint that a former employee breached their nonsolicitation agreement. No. 2:17-CV-888-RJS, 2017 WL 3834745, at *2 (D. Utah Aug. 31, 2017). The nonsolicitation agreement was "facially valid and enforceable," the court found, where the underlying provision prohibited the employee from "directly or indirectly solicit[ing] any . . . employees to leave [the company]." *Id.* (alterations in original).

Relatedly, in *Slicex, Inc. v. Aeroflex Colorado Springs, Inc.*, the court analyzed a three-year nonsolicitation agreement that was similar to Knoch and Rysavy's agreements, defining the scope of the provision's "solicit or take away" language, but otherwise giving effect to the covenant. No. 2:04-CV-615-TS, 2006 WL 2088282, at *3 (D. Utah July 25, 2006). Because Defendants cite only out-of-state or otherwise inapplicable authorities for their overbreadth

argument, *see* Dkt. 12 at 16, the Court is not persuaded that Knoch and Rysavy's solicitation agreements are facially overbroad.

Although Spotter plausibly alleges that Knoch violated his solicitation agreement, Spotter fails to state a claim against Rysavy. Spotter's solicitation agreement prohibited Knoch and Rysavy from "directly or indirectly solicit[ing], induc[ing], recruit[ing] or encourag[ing] any of the Company's employees to leave their employment . . . either for [themselves] or for any other person or entity." Dkt. 1 at 46; Dkt. 14-1 at 4.

Spotter alleges that within six months of leaving the company, Knoch solicited a current employee, Anna Kim, to leave Spotter for Echodyne. *Id.* ¶¶ 112–114. To support this allegation, Spotter includes an excerpted text conversation between Knoch and another current Spotter employee, Gardner, where Knoch allegedly asks Gardner if Kim "would . . . be interested starting as inside sales with a track to becoming outside sales[.]'" *Id.* ¶ 113. Spotter further alleges that Knoch told "multiple Spotter employees" he could "help get them job offers" during the March 2023 trade show. *Id.* ¶ 112. And, following his conversation with Gardner about Kim, Knoch met with Kim and Gardner and later attended an Echodyne event with Kim. *Id.* ¶ 113. Accordingly, Spotter has "ple[d] factual content that allows the court to draw the reasonable inference that [Knoch] is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

In contrast, Spotter does not support its allegation that Rysavy violated his solicitation agreement with any facts. First, Spotter does not identify what parts of its complaint support its breach of contract claim that Rysavy "solicit[ed] Spotter employees." Dkt. 1 ¶ 198. Second, among the likeliest support, Spotter's allegations are devoid of fact. Spotter asserts that "[g]iven the opportunity for further investigation and discovery, Spotter will likely have evidence that Rysavy encouraged Anna Kim to leave her employment with Spotter by making disparaging and derogatory comments about Spotter to encourage her departure as an employee of Spotter." *Id.*

¶ 152. Because Spotter's allegation does not "raise a right to relief above the speculative level,"

Spotter's claims against Rysavy based on his alleged violation of the solicitation provision are

dismissed. *See Twombly*, 550 U.S. at 555.

### 3.    Non-disparagement/defamation

Spotter alleges that Knoch breached his contract by "disparaging Spotter as alleged in

paragraphs 115–121[.]" Dkt. 1 ¶ 156. Spotter similarly alleges that Rysavy "disparag[ed] Spotter

as alleged in paragraph 152" in breach of his contract. *Id.* ¶ 198. Defendants argue that most of

Spotter's allegations of disparagement are speculative and do not state a claim of relief. *See*

Dkt. 12 at 19–20. Defendants also contend that Spotter's "more concrete" allegation against

Knoch, contained in a November 17, 2022 email to Walaris, is barred by the statute of

limitations for defamation claims. *Id.* at 20. Even if not barred, Defendants argue that the alleged

statement "is not defamatory or disparaging." *Id.*

First, Defendants are incorrect that Spotter's allegation is barred by the statute of

limitations for defamation claims. *See id.* Defendants cite *Jensen v. Sawyers* for the proposition

that defamation claims fall within a one-year statute of limitations. Dkt. 12 at 20 (citing 130 P.3d

325, 333 (Utah 2005)). Because Spotter's complaint was filed "more than two years after

Knoch's purported email," Defendants argue that the claim necessarily fails. *Id.* But *Jensen* did

not analyze a non-disparagement provision of a contract. *See Jensen*, 130 P.3d at 333. Instead,

the Utah Supreme Court applied a defamation claim's one-year statute of limitations to the

separate tort of false light invasion of privacy. *Id.* Defendants' other cited case to support treating

the non-disparagement clause of Knoch's contract as a defamation claim subject to its statute of

limitations similarly analyzes the overlap between defamation and other speech-based torts. *See*

*Keisel v. Westbrook*, 542 P.3d 536, 556 (Utah Ct. App. 2023), *cert. denied*, 554 P.3d 1097 (Utah

2024); Dkt. 12 at 20. The Court, therefore, is not persuaded that it must apply a defamation claim's statute of limitations to Spotter's breach of contract cause of action. *See* Dkt. 1 ¶ 156.

Next, the Court finds that Spotter has a plausible claim for disparagement against Knoch based on the comments he made about Spotter to Walaris. Neither party cites, nor has the Court identified, case law analyzing a non-disparagement clause under Utah law. But district courts in the Tenth Circuit evaluating non-disparagement clauses in employment contracts, as well as Utah law analyzing whether a statement is defamatory, support Spotter's claim at the 12(b)(6) stage.

For example, in *AMG National Corp. v. Wright*, a Colorado district court evaluated whether a company could enforce a non-disparagement provision of an employment agreement against a former employee as a breach of contract. No. 20-CV-02857-PAB-KLM, 2021 WL 4170459, at *6–8 (D. Colo. Sept. 14, 2021). The employee agreement's non-disparagement clause required that the employee "not criticize, disparage, or speak adversely about AMG . . . or make any communication, whether oral [or] written . . . that has the effect of damaging the professional . . . reputation . . . of AMG[.]" *Id.* at *6. After the employee left the company, he created a website that "published the names of clients and their personal information and disparaged plaintiffs." *Id.* (citation modified). The court found that the non-disparagement provision was enforceable "in the absence of specific legislative direction to the contrary." *Id.* at *8 (citation omitted); *see also Biles v. Schneider,* No. 19-CV-48-F, 2020 WL 10356508, at *11 (D. Wyo. Sept. 10, 2020) (finding that a non-disparagement clause of a settlement agreement was enforceable and did not violate public policy); *Patterson v. Knight*, 391 P.3d 1075, 1077 (Utah Ct. App. 2017) ("Non-disparagement clauses are common contractual provisions[.]"). Finding that the posts "caused plaintiffs reputational damage and lost business opportunities,"

the court concluded that AMG had stated a claim for breach of the employment contract. *AMG Nat'l Corp.*, 2021 WL 4170459, at *8.

Likewise, Spotter's non-disparagement clause is enforceable in the absence of contrary Utah law and plausibly alleges a violation of Knoch's agreement. Spotter alleges that Knoch emailed Walaris, a competitor and one-time partner, stating, "Given the somewhat tenuous nature of the company in Utah, they tend to get very focused on finding conspiracies wherever they can." Dkt. 1 ¶ 116. In the related defamation context, Utah courts have evaluated whether a statement is a protected expression of opinion or defamatory based in part on the "full context of the statement" and the "broader setting in which the statement appears." *RainFocus Inc. v. Cvent Inc.*, 528 P.3d 1221, 1230–34 (Utah Ct. App. 2023) (concluding that potentially defamatory statements emailed by the defendant's CEO to potential customers of the plaintiff company supported a finding that they are subject to a defamatory meaning and so could not be dismissed at 12(b)(6) stage). Here, too, the broader context of Knoch's statements cautions against dismissal. Knoch's email was made within four months of Spotter's "exploratory relationship" with Walaris ending, a collaboration Knoch was aware of. *Id.* ¶¶ 56, 61. The comment was also made around the time Knoch was alleged to have begun working with Walaris while still employed at the company, and within a month of allegations that Knoch offered to provide Spotter's proprietary information to Walaris to help compete with it. *Id.* ¶¶ 66, 73, 76. Accordingly, the Court finds that Spotter has "ple[d] factual content that allows the court to draw the reasonable inference" that Knoch violated the non-disparagement clause of his employment agreement. *See Iqbal*, 556 U.S. at 678; Dkt. 1 ¶ 116.

As for Spotter's other allegations of disparagement against Knoch, the Court agrees with Defendants that they fail to rise "above the speculative level" and must be dismissed. *See Twombly*, 550 U.S. at 555. Similarly, Spotter's claim against Rysavy based on his alleged

violation of the non-disparagement provision is based on the same "speculative" paragraph of the complaint dismissed in the solicitation context. *Id.*; Dkt. 1 ¶ 152 ("Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Rysavy encouraged Anna Kim to leave her employment with Spotter by making disparaging and derogatory comments about Spotter to encourage her departure as an employee of Spotter."). For the same reason, Spotter's claims against Rysavy based on his alleged violation of the non-disparagement provision of his contract are dismissed. *See id.* ¶ 198; *Twombly*, 550 U.S. at 555.

### 4.   Confidentiality

Finally, Spotter alleges that Knoch breached his employment agreement by "misappropriating and/or using confidential, proprietary, and/or intellectual property belonging to Spotter in violation of his confidentiality provision[.]" Dkt. 1 ¶ 156. Spotter further alleges that Knoch "improperly us[ed] and disclos[ed] Spotter's confidential information and trade secrets including Spotter's Networked IO program, source code and operating manuals." *Id*. Spotter identically alleges that Rysavy "misappropriate[ed] and/or us[ed] confidential, proprietary, and/or intellectual property belonging to Spotter in violation of his confidentiality provision" in breach of his contract. *Id.* ¶ 198. Spotter also asserts that Rysavy "improperly us[ed] and disclos[ed] Spotter's confidential information and trade secrets[.]" *Id.*

As it relates to the allegations against Knoch, Defendants do not contest the sufficiency of Spotter's allegations but argue that Knoch's confidentiality clause "is so vague that it is unenforceable and essentially meaningless." Dkt. 12 at 17. With respect to similar claims against Rysavy, Defendants instead argue that "Spotter does not provide facts that plausibly support a claim that Rysavy breached his confidentiality provision." *Id.* at 21.

The Court rejects Defendants' vagueness argument against the enforceability of Knoch's confidentiality agreement because the plain language of the provision defines its scope and gives

examples of what constitutes "confidential information." *See id.* at 17; Dkt. 1 at 44 ("[A]ny nonpublic information that relates to the actual or anticipated business or research and development of the Company, Company proprietary information, technical data, trade secrets or knowhow[.]"). In addition to identifying what is "confidential information," the provision also defines what is not confidential. Dkt. 1 at 44 ("Confidential Information does not include any of the foregoing items that has become publicly known and made generally available through no wrongful act of mine or of others[.]"). Defendants cite to two cases to support their vagueness argument, but the first does not analyze Utah law and the second does not address the scope of a confidentiality agreement nor its related enforceability. *See* Dkt. 12 at 17 (first citing *R.R. Donnelley & Sons Co. v. Fagan*, 767 F. Supp. 1259, 1269 (S.D.N.Y. 1991); then citing *Microbiological Rsch. Corp. v. Muna*, 625 P.2d 690, 697 (Utah 1981)). Because Spotter's confidentiality clause is not too vague to be enforceable and Defendants do not otherwise challenge Spotter's factual allegations against Knoch, the Court declines to dismiss these allegations against Knoch at this stage.

But Defendants are correct that Spotter's claims against Rysavy for misappropriating confidential information fail to state a claim for relief. Dkt. 12 at 21. Spotter alleges that Rysavy "intentionally accessed and downloaded all versions of NetworkedIO" even though the "only files that would have been useful in in the course and scope of his duties at the time" was the latest version of NetworkedIO. Dkt. 1 ¶ 137. But the paragraphs of the complaint that Spotter cites to support Rysavy's alleged confidentiality breach do not allege that the downloads were disclosed beyond Rysavy's work. *See id.* ¶ 198 (citing ¶¶ 134–51). Instead, the cited paragraphs variously review Rysavy's position and bonus negotiations with Spotter, his post-Spotter employment history, and some allegations that Rysavy helped compete against Spotter after he left. *See id.* ¶¶ 134–51.

Spotter points out in its response that it does sufficiently allege misappropriation by Rysavy, citing its allegation that "Knoch, Rysavy, and Mandrell misappropriated [Spotter's] confidential information to steal Spotter's clients and/or support Spotter's competitors, and to create competing businesses such as TKG Security." *Id.* ¶ 173; *see* Dkt. 17 at 18. Spotter also cites to its allegation that "[g]iven the opportunity for further investigation and discovery Spotter will likely have evidence that Knoch, Rysavy, and Mandrell provided Spotter's confidential information to TKG for its benefit[.]" Dkt. 1 ¶ 174; *see* Dkt. 17 at 18. The Court first notes that Spotter alleges these actions to support its UTSA claim (Cause Four) against all Defendants, not its breach of contract claim (Cause Seven) against Rysavy. Dkt. 1 ¶¶ 173–74. But even as pled and drawing all inferences in favor of Spotter, its allegations that Rysavy "use[d] or disclose[d]" Spotter's trade secrets in breach of his confidentiality agreement, *see* Dkt. 14-1 at 2, are either conclusory or lack facts to allege a plausible claim for relief, Dkt. 1 ¶¶ 173–74; *see Iqbal*, 556 U.S. at 678. Thus, Spotter's claims against Rysavy based on his alleged violation of the confidentiality provision are dismissed. *See* Dkt. 1 ¶ 198.

**C.    Breach of the duty of good faith and fair dealing and duty of loyalty**

Defendants move to dismiss Spotter's breach of the duty of good faith and fair dealing (Causes Two and Eight) and breach of the duty of loyalty (Causes Three and Nine) claims against Knoch and Rysavy. Dkt. 12 at 13, 21–22; Dkt. 18 at 10–11; Dkt. 12-1 at 2.

*1.    Duty of good faith and fair dealing*

Spotter contends that Knoch violated the implied covenant of good faith and fair dealing "by continuing his employment with Spotter and engaging in conduct that purposefully and intentionally injured Spotter's right to receive the benefits of its agreement with Knoch[.]" Dkt. 1 ¶ 161. Spotter describes the violative conduct as "taking meetings, engaging in negotiations and other activities for Knoch or TKG's benefit and Spotter's detriment and taking Spotter's

confidential information and copying the same on his own personal devices[.]" *Id.* Spotter also alleges that Rysavy breached the duty of good faith and fair dealing by "continuing his employment with Spotter and engaging in conduct that purposefully and intentionally injured Spotter's right to receive the benefits of its agreement[.]" *Id.* ¶ 203. Defendants argue that Spotter's claims against Knoch and Rysavy must be dismissed because a "plaintiff cannot plausibly allege a claim for breach of implied covenant and good faith and fair dealing . . . by 'merely restat[ing] their breach of contract claim.'" Dkt. 12 at 21–22 (quoting *Cheney v. Hinton Burdick Hall & Spilker, PLLC*, 366 P.3d 1220, 1225 (Utah Ct. App. 2015)).

"The implied covenant of good faith and fair dealing inheres in most contractual relationships and requires a party in a contract to perform 'consistent with the agreed common purpose and the justified expectations of the other party.'" *Cheney*, 366 P.3d at 1225 (quoting *Oakwood Vill. LLC v. Albertsons, Inc.*, 104 P.3d 1226 (Utah 2004)). "An examination of express contract terms alone is insufficient to determine whether there has been a breach of the implied covenant of good faith and fair dealing." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991). Under Utah law, to "comply with their implied duties under this covenant, contracting parties must act consistent with the contract's purpose and the other party's expectations, and may not intentionally injure each other's right to receive the benefit of the bargain." *Behav. Med. Consulting, LLC v. CHG Companies, Inc.*, No. 23-4047, 2024 WL 4235124, at *4 (10th Cir. Sept. 19, 2024) (citations omitted); *see also St. Benedict's Dev. Co.* 811 P.2d at 199–200 ("Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract.") (citations omitted).

Spotter has sufficiently alleged facts that Knoch "intentionally injure[d]" its right to receive the benefit of the bargain. *See Behav. Med.*, 2024 WL 4235124, at *4. Spotter plausibly

alleges that Knoch pursued a partnership with competitor and one-time partner Walaris for his own benefit while still employed at Spotter, including by allegedly accessing proprietary documents just prior to his meeting with Walaris at GSX. Dkt. 1 ¶¶ 63–69. Spotter also alleges that in the months leading up to these meetings, Knoch was aware that Spotter and Walaris had executed an MNDA "towards a collaboration[,]" which Spotter alleges ended soon after Knoch's meetings with Walaris' CEO took place. *Id.* ¶¶ 55–56, 59–61.

Although these allegations also formed the basis for some of Spotter's breach of contract claims, *see id.* ¶ 156, the Court's inquiry with respect to this claim is whether Spotter has alleged facts supporting an inference that Knoch "intentionally or purposely" acted to "destroy or injure [Spotter's] right to receive the fruits of the contract." *St. Benedict's Dev. Co.* 811 P.2d at 199–200 (citations omitted); *cf. Cheney*, 366 P.3d at 1225 ("[Plaintiff's] argument merely restates their breach of contract claim without explaining which obligations [Defendant] has failed to perform or how its actions were . . . intentional[.]"). Here, Spotter alleges that Knoch's actions—including "taking meetings, engaging in negotiations and other activities for Knoch or TKG's benefit and Spotter's detriment and taking Spotter's confidential information"—breached the implied duty of good faith Knoch owed Spotter. Dkt. 1 ¶ 161. At this stage, Spotter has plausibly pled its claim.

In contrast, Spotter has not alleged facts to support a breach of the implied duty of good faith and fair dealing claim against Rysavy. Spotter cites seven allegations in its complaint that purportedly support this claim. Dkt. 1 ¶ 203 (citing ¶¶ 132–37, 152). But four of them allege only that "[g]iven the opportunity for further investigation and discovery, Spotter will likely have evidence" to support its claim. *See id.* ¶¶ 132–34, 152. While the complaint "does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555, it still "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face,'"

*Boquist*, 32 F.4th at 773 (quoting *Iqbal*, 556 U.S. at 678). Because these allegations do not contain any facts, the Court is unable to draw "the reasonable inference" that Rysavy is liable for breaching the implied duty of good faith and fair dealing. *See Iqbal*, 556 U.S. at 678.

Spotter's three other allegations fare no better. Two of Spotter's remaining allegations describe Rysavy's position change and bonus negotiations, which Spotter granted. Dkt. 1 ¶¶ 135–36. The remaining allegation, that Rysavy downloaded multiple versions of SpotterIO and reference guides on configuring NetworkedIO, despite only needing the latest version of the software for his job, fails to allege that he used or disclosed these files outside the scope of employment. *See* Dkt. 1 ¶ 137. As a result, Spotter has failed to state a plausible claim of relief that he violated the implied covenant of good faith and fair dealing. *See id.* ¶¶ 200–04.

### 2.    Duty of loyalty

Spotter cites the same underlying set of facts to support its claim that Knoch also "violated his common law duty of loyalty to Spotter." Dkt. 1 ¶ 165. Spotter similarly alleges a subset of the facts advanced in its breach of the duty of good faith and fair dealing claim against Rysavy to support its breach of the duty of loyalty claim. *Id.* ¶ 207. Defendants argue that, like the duty of good faith and fair dealing, because Spotter's duty of loyalty claims are no different from its breach of contract claims, Spotter has failed to state a claim upon which relief can be granted. Dkt. 12 at 22.

At a threshold level, Utah law recognizes that a duty of loyalty claim may arise out of breach of contract claim. "In Utah, a claim for breach of fiduciary duty is an independent tort that, on occasion, arises from a contractual duty[.]" *Norman v. Arnold*, 57 P.3d 997, 1006 (Utah 2002) (citation omitted); *see also d'Elia v. Rice Dev., Inc.*, 147 P.3d 515, 524 (Utah Ct. App. 2006), *holding modified by Jones & Trevor Mktg., Inc. v. Lowry*, 284 P.3d 630 (Utah 2012) (same). Utah courts have also recognized that facts supporting an employer's breach of contract

claim against a former employee can also support an independent breach of the duty of loyalty claim. *See Premier Sleep Sols., LLC v. Sound Sleep Med., LLC* 220CV00062JNPJCB, 2021 WL 1192579, at *2, 7 (D. Utah Mar. 30, 2021) (denying a motion to dismiss an employer's claim that former employees violated their fiduciary duties of loyalty, which cited facts alleging unlawful solicitation that also supported its breach of contract claims). Thus, Spotter may allege duty of loyalty claims against Knoch and Rysavy based on similar facts alleged in its breach of contract claims. *See* Dkt. 1 ¶¶ 165, 207.

The fiduciary duty of loyalty "arises out of an agent's fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship." *Premier Sleep Sols., LLC*, 2021 WL 1192579, at *6 (citation modified). "[A]lthough it is most common for courts to address the fiduciary duties of corporate officers and directors, 'there is no basis for concluding these are the only types of agents subject to fiduciary duties.'" *Id.* (quoting *Prince, Yeates & Geldzahler v. Young*, 94 P.3d 179, 184 (Utah 2004)). Typically, Utah courts evaluate the existence of a fiduciary relationship based on a multifactor test that "depends on the facts and circumstances of each individual case." *Id.* (quoting *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1333 (Utah 1990)). The Utah Supreme Court has stated that it "need not, and do[es] not, decide . . . whether all 'mere employees' owe fiduciary duties to their employers not to compete with the employer's legitimate business interests." *Prince,* 94 P.3d at 185 n.2; *see also Wachocki v. Luna*, 330 P.3d 717, 722 (Utah Ct. App. 2014) ("[T]he Utah Supreme Court has explicitly left open the question of whether every 'mere employee' owes a duty of loyalty to not compete with her employer.") (citation omitted).

Spotter has alleged sufficient facts for its duty of loyalty claim against Knoch to survive a motion to dismiss. As before, Spotter plausibly alleges that Knoch pursued a partnership with competitor and one-time partner Walaris for his own benefit while still working for Spotter,

including by allegedly accessing proprietary documents just prior to his meeting with Walaris at GSX. Dkt. 1 ¶¶ 63–69. Although Spotter has alleged facts that could form the basis of a duty of loyalty claim, the Court notes that Spotter has not alleged facts that Knoch owed Spotter a duty of loyalty as a "mere employee" of the company beyond a conclusory statement. *See id.* ¶ 164 ("Spotter as a result of its employment of Knoch was owed a fiduciary duty of loyalty[.]"); *see also Prince*, 94 P.3d at 185 n.2. Because evaluating whether a fiduciary relationship exists "depends on the facts and circumstances of each individual case," the Court finds that a determination at the 12(b)(6) stage is premature. *See Premier Sleep Sols., LLC*, 2021 WL 1192579, at *6 (citation omitted). But to prove its duty of loyalty claim at a later stage of this case, Spotter will have to show specific facts that create a duty of loyalty for Knoch.

As with Spotter's duty of good faith and fair dealing claim, Spotter has not alleged facts to support a duty of loyalty claim against Rysavy. Spotter supports this cause of action through a subset of the allegations it proffered for its duty of good faith and fair dealing claim. *See* Dkt. 1 ¶ 207 (citing ¶¶ 132, 134, 137, 152). For the same reasons the Court described above, *see supra* Sec. V.C.1, Spotter has failed to state a plausible claim of relief that Rysavy violated a common law duty of loyalty to Spotter. *See* Dkt. 1 ¶¶ 205–08.

### D.    Intentional interference with contractual relationship

Spotter alleges that Knoch and Rysavy "intentionally interfered" with Spotter's contractual relationships by "improper means and with an improper motive . . . causing the termination of these contracts." Dkt. 1 ¶ 183. Spotter supports this claim against Knoch by citing paragraphs 115 through 121 of the complaint, and against Rysavy by citing paragraph 152. *Id.* Spotter cites the same facts to support this cause of action as it does for its claim that Defendants violated their non-disparagement agreements in breach of their contracts. *Id.*; *see also id.* ¶¶ 156, 198. Like its argument for dismissing the non-disparagement claim, Defendants argue that most

of the alleged facts supporting this claim against Knoch and all the alleged facts purporting to support the claim against Rysavy are "completely devoid of factual content[.]" Dkt. 12 at 24. For the reasons explained above, *see supra* Sec. V.B.3, the Court agrees. *See Twombly*, 550 U.S. at 555.

But Spotter sufficiently pleads that Knoch's allegedly disparaging email to Walaris also states a claim for relief under an intentional interference with a contractual relationship theory. *See* Dkt. 1 ¶ 183 (citing *id.* ¶ 116). "In order to win a tortious interference claim under Utah law, a plaintiff must . . . prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015) (citation modified). Although the Utah Supreme Court has "defined improper means narrowly," it has endorsed a "non-exhaustive list of conduct that would constitute improper means: violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood[s]." *C.R. England v. Swift Transp. Co.*, 437 P.3d 343, 353 (Utah 2019) (citation modified).

Defendants argue that since Spotter "makes no allegation as to the purpose" of Knoch's email, including the "context about why the email was sent," Spotter cannot support an allegation of intentional interference with a contractual relationship. Dkt. 12 at 24–25. The Court has discussed the context of Knoch's email to Walaris, as alleged elsewhere in Spotter's complaint. *See supra* Sec. V.B.3. Knoch was aware that Spotter and Walaris, competitors that were developing similar product features, had signed an MNDA in the months prior to his email. Dkt. 1 ¶¶ 55–56. Spotter also alleges that while Knoch was still working for the company, he set up meetings with Walaris' CEO for the benefit of him and TKG and that soon thereafter, "Spotter's exploratory relationship with [Walaris] ceased." *Id.* ¶ 61; 57–60. Finally, the Court

1

has determined that Spotter has plausibly alleged that Knoch's email to Walaris was a

2

disparaging statement in violation of the non-disparagement/defamation provision of his

3

employee agreement. *See supra* Sec. V.B.3. Because Spotter has sufficiently pled facts that meet

4

each element of an intentional interference with a contractual relationship claim, the claim

5

against Knoch may move past the 12(b)(6) stage. *See Eldridge*, 345 P.3d at 565; *C.R. England*,

6

437 P.3d 343, 353–54.

7

**E.      Uniform Trade Secrets Act and Defend Trade Secrets Act**

8

        Spotter alleges that all Defendants misappropriated Spotter's trade secrets in violation of

9

the Washington Uniform Trade Secrets Act ("UTSA"), RCW 19.108.010 *et seq* (Cause Four),

10

and federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq* (Cause Six).

11

Defendants move to partially dismiss these claims, arguing that Spotter has failed to state a claim

12

for trade secret misappropriation against Rysavy, Mandrell, and SSI.[2] Dkt. 12 at 23–24; Dkt. 12-

13

1 at 2. As mentioned above, the parties have agreed to mediate the DTSA and UTSA claims

14

against Mandrell, Dkt. 17 at 6, so the Court only considers Spotter's allegations against Rysavy

15

and SSI.

16

        "The relevant portions of the DTSA and the UTSA are almost identical." *Bombardier*

17

*Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1178 (W.D. Wash. 2019); *compare* 18

18

U.S.C. § 1839(5), *with* RCW 19.108.010(2)). "A plaintiff asserting a DTSA or UTSA claim must

19

establish that its trade secrets were misappropriated." *Id.* (citation omitted). Both laws define

20

misappropriation as follows:

21

22

23

24

[2] Defendants request for the first time in their reply that TKG also be dismissed from Causes
Four and Six. Dkt. 18 at 13. Because Defendants could have made this argument in their initial
motion to dismiss, the Court declines to consider its argument at this stage. *Autotel v. Nevada
Bell Tel. Co.*, 697 F.3d 846, 852 n.3 (9th Cir. 2012) ("Arguments raised for the first time in a
reply brief are waived.").

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who--

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

*Id.* (quoting 18 U.S.C. § 1839(5); RCW 19.108.010(2)). The parties do not dispute that Spotter has protectable trade secrets, including its NetworkedIO software. *See* Dkt. 12 at 23–24; Dkt. 1 ¶ 168. Rather, Defendants argue that Spotter fails to allege sufficient facts showing Rysavy or SSI misappropriated those trade secrets. Dkt. 12 at 23–24. The Court agrees.

Spotter's allegations that Rysavy and SSI violated the DTSA and UTSA are too speculative to sustain a claim for relief. With respect to Rysavy, Spotter alleges that he had access to Spotter's trade secrets through his employment and that Spotter took reasonable steps to preserve the confidentiality of its proprietary information, including by requiring Rysavy to sign a confidentiality agreement. Dkt. 1 ¶¶ 170–71, 188. But Spotter does not allege that Rysavy "disclose[d] or use[d]" Spotter's trade secrets. *See Bombardier Inc.* 383 F. Supp. 3d at 1178; *see generally* Dkt. 1. The closest Spotter gets to alleging misappropriation by Rysavy is either conclusory, *see id.* ¶ 173 ("Knoch, Rysavy, and Mandrell misappropriated this confidential information to steal Spotter's clients and/or support Spotter's competitors, and to create competing businesses such as TKG Security."), or lacks facts to support a plausible claim of

1   misappropriation, *see id.* ¶ 174 ("Given the opportunity for further investigation and discovery

2   Spotter will likely have evidence that Knoch, Rysavy, and Mandrell provided Spotter's

3   confidential information to TKG[.]").

4           Spotter disputes that it failed to allege misappropriation, pointing out that it "alleged that

5   Knoch and Rysavy could not have integrated a competing software without using Spotter's

6   confidential information," and that "not know[ing] the exact parameters of the confidential

7   information used and the manner of its use" does not doom its claim. Dkt. 17 at 20 (citing Dkt. 1

8   ¶ 88). But Spotter's cited allegation refers only to Knoch. Dkt. 1 ¶ 88 ("Knoch could not have

9   integrated a competing product into Spotter's NetworkedIO[.]"); *see also id.* ¶ 87 ("Knoch and

10  Mandrell[] are the only individuals not currently employed with Spotter believed to have

11  knowledge sufficient to configure NetworkedIO to integrate a non-Spotter device[.]"). Because

12  Spotter neither alleges that Rysavy misappropriated its trade secrets, nor alleges facts sufficient

13  for the Court to reasonably infer misappropriation, the UTSA and DTSA claims against him are

14  dismissed. *See* Dkt. 1 ¶¶ 167–80; 185–94; *see also Trusov,* 2023 WL 6147251, at *2 ("[I]n a case

15  alleging the same claim against multiple defendants, there must be specific allegations

16  explaining what each defendant allegedly did wrong, rather than general allegations asserted

17  against them as a group.") (citation omitted).

18          For the same reason, Spotter's trade secret misappropriation claims against SSI also fail.

19  *See* Dkt. 1 ¶¶ 167–80; 185–94. Spotter only speculates that "[g]iven the opportunity for further

20  investigation and discovery [it] will likely have evidence" that "Knoch, Rysavy, and Mandrell"

21  provided Spotter's confidential information to TKG, who in turn used it to "assist[] SSI" in

22  developing a competing C2. *See id.* ¶ 174. Spotter further speculates that "[g]iven the

23  opportunity for further investigation and discovery [it] will likely have evidence" that SSI

24  "knew, or had reason to know, that Knoch and Rysavy acquired Spotter's confidential

information through improper means[.]" *Id.* ¶ 175; *see also id.* ¶ 189 ("Upon information and belief, TKG and SSI knew, or should have known, of Knoch, Rysavy, and Mandrell's duty to maintain the confidentiality of Spotter's information as, among other things, Knoch is the President of TKG and Knoch helped form SSI."). As the Court has explained, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Accordingly, Spotter's UTSA and DTSA claims against SSI are also dismissed.

## VI.    CONCLUSION

For the reasons stated, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss (Dkt. 12). The Court ORDERS as follows:

- Defendants' motion to dismiss all breach of contract allegations against Edward Knoch and Merrit Rysavy based on the noncompetition agreements of their contracts is GRANTED (Cause One and Seven). This dismissal is WITH PREJUDICE.

- Defendants' motion to dismiss all other breach of contract claims against Rysavy is GRANTED (Cause Seven). This dismissal is WITHOUT PREJUDICE.

- Defendants' motion to dismiss breach of the implied duty of good faith and fair dealing claims against Rysavy is GRANTED (Cause Eight). This dismissal is WITHOUT PREJUDICE.

- Defendants' motion to dismiss breach of the duty of loyalty claims against Rysavy is GRANTED (Cause Nine). This dismissal is WITHOUT PREJUDICE.

- Defendants' motion to dismiss Uniform Trade Secrets Act claims against Rysavy and SSI is GRANTED (Cause Four). This dismissal is WITHOUT PREJUDICE.

- Defendants' motion to dismiss Defend Trade Secrets Act claims against Rysavy and SSI is GRANTED (Cause Six). This dismissal is WITHOUT PREJUDICE.

- Defendants' motion to dismiss intentional interference with contractual relationship claims against Rysavy is GRANTED (Cause Five). This dismissal is WITHOUT PREJUDICE.

- Defendants' motion to compel mediation of all claims against Jon Mandrell is GRANTED (Causes Four, Six, and Ten). All claims against Mandrell are STAYED pending the result of mediation.

In its opposition brief, Spotter requests leave to amend the complaint. Dkt. 17 at 21. Spotter has not yet amended its complaint in this litigation and is within the deadline set by the case schedule for amending pleadings. *See* Dkt. 21. "In dismissing for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Creech v. Tewalt*, 84 F.4th 777, 787–88 (9th Cir. 2023) (citation modified). Except for claims arising from the noncompetition agreements that are void as a matter of law, it is conceivable that the defects in Spotter's complaint could be cured by amendment. Leave to amend is therefore GRANTED for the claims the Court has dismissed without prejudice. If Spotter wishes to file an amended complaint, it must do so by June 12, 2025.

Dated this 29th day of May, 2025.

Tiffany M. Cartwright
United States District Judge