Mark G. Passannante (25680)
**Broer & Passannante, P.S.**
8904 NE Hazel Dell Ave.
Vancouver, WA 98665
mark@broerandpassannante.com

Jacob A. Green (Utah Bar #15146) (admitted *pro hac vice*)
Christopher M. Sanders (Utah Bar #16939) (admitted *pro hac vice*)
**Kirton McConkie**
2600 W. Executive Parkway
Suite 400
Lehi, UT 84043
jgreen@kmclaw.com
csanders@kmclaw.com

*Attorneys for Plaintiff SpotterRF LLC*

---

## UNITED STATES DISTRICT COURT IN AND FOR THE

## WESTERN DISTRICT OF WASHINGTON

## TACOMA DIVISION

| | |
|---|---|
| SPOTTERRF LLC, a Utah Limited Liability Company, | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY DEMAND** |
| vs. | Civil No. 3:24-cv-05994-TMC |
| EDWARD KNOCH, individually, MERRITT RYSAVY, individually, THE KNOCH GROUP, LLC, a Delaware limited liability company, , | District Judge Tiffany M. Cartwright |
| Defendants. | |

Plaintiff SpotterRF LLC ("**Spotter**"), by counsel and pursuant to the Federal Rules of Civil

Procedure, complains against Defendants Edward Knoch ("**Knoch**"), Merritt Rysavy ("**Rysavy**")

The Knoch Group, LLC ("**TKG**"), (collectively, "**Defendants**") as follows:

## PARTIES

1.      Spotter is a Utah limited liability company with its principal place of business in Utah County, Utah.

2.      Spotter's members are residents or citizens of Virginia and Utah.

3.      Knoch is an individual residing in and a citizen of Battle Ground, Washington.

4.      Rysavy is an individual residing in and a citizen of Draper, Utah. Through his involvement with Knoch and TKG, at least some of the acts and part of the transactions from which this action arises are connected to or occurred in the State of Washington.

5.      TKG, d/b/a TKG Security, is a Delaware limited liability company with its headquarters in Battle Ground, Washington.

## JURISDICTION, VENUE, AND DISCOVERY TIER

6.      The Court has subject matter jurisdiction to hear this matter pursuant to 28 U.S.C. § 1332 on the basis of diversity of jurisdiction because the amount in controversy exceeds the sum of $75,000 exclusive of interests and costs, and the action is between parties of different states.

7.      The Court also has subject matter jurisdiction to hear this matter pursuant to 28 U.S.C. § 1331 on the basis of federal question jurisdiction because Spotter asserts one or more claims arising under federal law.

8.      The Court also has supplemental jurisdiction to hear Spotter's remaining claims pursuant to 28 U.S.C. § 1367 as its remaining claims arise from the same set of facts as Spotter's claims that arise under federal law.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b) and the Court has personal jurisdiction against each Defendant. Knoch and TKG both reside in this judicial

4863-5079-9755.v2

district. Rysavy has entered into a contractual relationship with TKG, headquartered in Washington, regularly communicates with Knoch and TKG, performs services for Knoch and TKG, and, on information and belief, has purposefully acted or consummated transactions in Washington at least some of which are connected to this action or from which this action arises.

## **FACTUAL BACKGROUND**

Knoch's Employment with Spotter

10.     Spotter, also known as "Spotter Global," was founded in 2009 to develop and manufacture Compact Surveillance Radar ("CSR") to protect military personnel deployed around the world.

11.     Spotter advertises that CSR is "the world's first advanced [CSR] system for perimeter, ground, air, sea and drone detection leveraging artificial intelligence."

12.     Spotter moved towards commercial industries in 2013 to protect critical infrastructure, including airports, bridges, businesses, farms, construction sites, dams, oil wells, prisons, residential properties, and more.

13.     Spotter is on the cutting edge of the development and implementation of: ground and aerial perimeter surveillance radar, including related software and components; counter-drone technologies, including related software and components; software integration of radars, cameras, and other components; artificial intelligence software that classifies and categorizes objects recognized by radars and cameras; the design of perimeter security plans; project management; project and system commissioning; radar performance monitoring software; and technical support. The verticals where Spotter sells its products and services include: airports, farms, critical infrastructure (dams, substation, etc.), data centers, military and government, fish farms, oil and

3

gas, correctional facilities, rapid deployment, high-end residential, and substations, etc.

14.    Spotter, among other things, creates perimeter security designs for its clients, a task that Knoch helped Spotter with while employed by Spotter.

15.    Spotter also provides consulting services, design advice, and project management for companies looking to purchase radar devices, accompanying software and support services.

16.    A decade ago, when Spotter first began its relationship with Knoch, Spotter sold 8 items. Now, Spotter offers at least 105 items.

17.    Spotter has continuously revised its existing products and software and created new hardware and software products since its formation. Knoch has been involved in those efforts.

18.    Among other products, Spotter released the 3D-500 in 2018, and two other new radar products, the CK5 and CK20 around August 2019 and the AX250-3D in Spring 2022—all while Knoch was employed at Spotter.

19.    Among other products, Spotter provides the AX-250, which is a counter-unmanned aircraft systems radar.

20.    Spotter services clients throughout the United States, and internationally, deriving at least one percent of its international sales from Spain, Germany, India, Mexico, Columbia, Ecuador, Canada, Chile, Argentina, Sweden, Japan, and South Africa, among other nations.

21.    Knoch accepted Spotter's offer of employment on April 30, 2018.

22.    Knoch was onboarded to Spotter's system on May 1, 2018, and he was given an email address and access to Spotter's documents. While still employed by his former employer, Knoch worked on Spotter projects outside of his normal work hours.

23.    Knoch began full-time employment with Spotter in or around July 2018 and

4

executed an Employment Agreement. *See* **Exhibit A,** incorporated herein.

24.     In that agreement, Knoch promised to hold Spotter's confidential information, including its software and other trade secrets, "in strictest confidence." *Id.* at § 1(a). Throughout Knoch's employment with Spotter, he has been privy to nonpublic confidential and proprietary information that has value, at least in part, because such information is not known by the public or readily available to the public. Knoch's position within Spotter granted him access to the confidential and proprietary information, which was far beyond the access granted to most employees at Spotter.

25.     Knoch also agreed not to engage in activities that conflict with Spotter's business while employed by Spotter, *id.* at § 3, to return Spotter documents and equipment upon termination of employment including purging such documents from Knoch's personal computers, *id.* at § 4, to not solicit Spotter's employees for 12 months following the end of his employment with Spotter, *id.* at § 6, and to not compete with Spotter while employed. *Id.* at §§ 7(a), (c).

26.     Knoch also agreed that he would not disparage or make derogatory comments about Spotter "whether written or oral, regarding SpotterRF or its current or former officers, directors, employees, attorneys, agents, or contracting parties, or its business or operations." Knoch agreed to pay attorney's fees, case costs, and liquidated damages of $5,000 for any disparaging or derogatory comment. *Id.* at § 8(a) & (b).

27.     On or about January 29, 2019, Knoch threatened to resign from Spotter if certain specific demands by Knoch were not met. He wrote multiple lengthy emails to renegotiate the terms of his work with Spotter.

28.     The first email was sent on January 29, 2019, with the email subject line of

5

"Musings from last night" (that also included an even longer attachment titled "Musings"). In that email, Knoch stated, "I have written what I think may cause me to consider staying – although my wife has reservations and isn't in total agreement with me right now. Nonetheless, I've strived to be as open as possible about changes and understand that you'll review this list with the goal of seeing how we can continue to directly partner with each other."

29.     Knoch expressed his frustration with his inability to gain a larger stake in Spotter, writing, "All I'll ever be is, potentially, a mid-level manager that takes home a salary and occasionally a bonus."

30.     Knoch continued making it clear that he was leaving Spotter unless they could come to an agreement on his future, writing, "**I have submitted to Brad my resignation (verbally) yesterday and consider that (1/28/2019) the beginning of my last two weeks of employ with SpotterRF prior to my departure <u>Unless</u> we can come to the terms in the attached note**" (emphasis in original) and "**<u>[a]s that was a verbal resignation, please consider this my formal resignation (once again pending review of my requirements for potentially staying at Spotter) effective the 28th of January, 2019</u>**." (emphasis in original)

31.     The "Musings" document attached to the email revealed Knoch's motive for threatening to resign, namely that Spotter did not, in his opinion, adequately acknowledge, "early adopters who pressed hard into transactions (like myself, Kenneth Nystrom [Securify AB], Jon Amack [IndustrialEnet] amongst others) who saw a [*sic*] opening and took a chance on something that was revolutionary."

32.     Spotter responded to Knoch's conditional resignation with an offer of continued employment with a promotion and additional consideration.

4863-5079-9755.v2

33.     On January 30, 2019, Knoch rejected Spotter's initial offer and emailed Spotter's upper management with a subject line of "Final Thoughts," which contained a counteroffer for Knoch to continue working with Spotter. He wrote, "[a]fter considerable wrestling with this decision and understanding that I am in a partnership (with my wife), I've written up a counter that she feels comfortable continuing with SpotterRF. Please note, I did leave this up to my lovely bride. You have her to thank, not me."

34.     Knoch continued, "I expect to get a 'new' offer letter…. Additionally, I anticipate that we (brad and I) will (in quick order) start the process of planning and execution to deal with short / medium and long-term goals." Knoch concluded his email stating, "I will need a full response today. I will either sign your letter today (as defined in the attached document) OR I will sign my offer letter for Jemez."

35.     After receiving Knoch's January 30, 2019 counter-offer, Spotter provided Knoch with an updated offer to continue his employment with Spotter. Knoch accepted Spotter's Offer Letter on January 31, 2019 with the parties observing the change in terms thereafter during Knoch's continued employment with Spotter. The accepted offer included a promotion for Knoch as Director of Sales in the Pacific NW and Canada where he oversaw Spotter's sales and support operations and the following additional consideration: a $15,000 signing bonus, an increase in salary, a change of title, increased responsibilities, an additional monthly payment of $1,000 to supplement Knoch's health plan premium, and an agreement to pay Knoch's relocation expenses from Alaska to Washington.

36.     The offer referenced an additional more comprehensive employment agreement than is given to new hires but was not included with the offer letter because Knoch had previously

4863-5079-9755.v2

executed an employment agreement with Spotter. *See* **Exhibit B**, incorporated herein.

37.     Knoch continued his employment after his conditional resignation date and Spotter adjusted both his pay and position as provided in the offer accepted by Knoch.

38.     Just prior to Knoch's last day with Spotter, on September 29, 2022, Knoch emailed Daniel Wilkinson, Spotter's General Counsel, his "employee agreement", which was the Offer Letter signed by Knoch on January 31, 2019.

39.     Upon information and belief, Knoch moved to Battle Ground, Washington in November 2020 and has maintained a home office at that location from that time until the present.

40.     In late 2021, Knoch was promoted to "Director of Services." In this role, Knoch was involved in: the training of the services team; technical support and training; the development of service level agreements and warranties; the development of a radar performance monitoring program; and weekly management meetings, discussing business plans and strategies.

41.     Throughout his time with Spotter, Knoch did business and traveled all over the world on behalf of Spotter. Knoch traveled many times throughout the United States as well as to Europe, Africa, and the Middle East as a representative of Spotter.

42.     Both prior to his employment with Spotter, and while employed at Spotter, Knoch received training from Spotter.

43.     In 2014 and 2016, Knoch received training from Spotter on topics such as sales, design, site layouts, and site surveying—services Knoch now provides through TKG that he claims Spotter does not.

44.     Mentoring and on-the-job training continued while Knoch was working for Spotter, such as a May 2018 business development training meeting.

4863-5079-9755.v2

45. Knoch was also directly involved in the development of software for Spotter, including the implementation of NetworkedIO features, the development of Spotter's Health Monitoring System and Service, including defining requirements, hiring a software developer, and generally leading development, and the development of source code for Spotter such as the ReplayUtility. The software and source code for all of the programs identified above are subject to reasonable procedures implemented by Spotter to maintain its confidentiality.

46. Spotter's NetworkedIO is a sensor management system that uses machine learning and Artificial Intelligence (AI) for the automatic classification of targets. Sensor management systems are referred to in the industry as "Command and Control" systems/platforms or "C2". "NetworkedIO" is Spotter's C2. A NetworkedIO Virtual Machine integrates multiple Spotter radars and PTZ cameras using a geo-referenced user interface that works right from your browser. NetworkedIO is sold as a standalone product that has specific commercial value. Spotter has invested millions of dollars in the development of NetworkedIO.

47. Knoch was aware of Spotter's use and intended uses of NetworkedIO as early as May 9, 2019 when Knoch made additions to Spotter's plans for NetworkedIO to the Security Sensor Management System.

48. As a result of his positions with Spotter and associated responsibilities, Knoch received access to Spotter's confidential information, was trained in site design and commissioning, supervised some of Spotter's employees, was involved in the development and implementation of many Spotter products and services, and had direct contact with Spotter's important clients and prospective clients.

49. Upon information and belief, Knoch purchased the website "tkg-security.com" on

September 1, 2022 with "tkg-security" believed to be a reference to TKG. As of that date, Spotter was still intending to have Knoch be one of its representatives at GSX.

50.    On or about September 10, 2022, Knoch gave written notice of his intention to resign his position with Spotter effective September 30, 2022, though his intention was to take "a leave of absence for the week of the 12th of September to attend GSX as an independent participant."

51.    Upon information and belief, rather than attending GSX and taking meetings as a representative of Spotter, and given the opportunity for further investigation and discovery, Spotter believes it will likely have evidence that Knoch met with multiple competitors of Spotter on his and/or TKG's behalf at GSX and immediately after the conference.

52.    Because Knoch's resignation letter specifically confirmed his intention to continue working for Spotter, Knoch's employment continued and he continued to receive pay from Spotter through September 30, 2022.

Knoch's Pre-resignation Competition and Breaches

53.    Earlier in 2022, Spotter was working directly with an individual named Kyle Meloney, the co-founder and CEO of an entity known as Tarsier (now "Walaris" following a name change), towards a collaboration in the industry. Walaris is in the business of video analytics/video AI. At that time, Knoch knew that Spotter was developing video analytics/video AI.

54.    Walaris and Spotter executed a Mutual Non-Disclosure Agreement on June 22, 2022. On information and belief, Knoch knew that Walaris and Spotter had entered into the agreement. As will be shown hereafter, Knoch interfered with the Mutual Nondisclosure Agreement personally, and on behalf of TKG, disclosing confidential and proprietary trade secrets

10

to Walaris outside of the agreement, thereby putting Spotter's protections under the agreement in jeopardy.

55.    Knoch was introduced to Meloney and Tarsier on July 14, 2022 via a meeting and demonstration arranged by John Hunsucker.

56.    In or about July 2022, Knoch began lashing out at Spotter executives for no apparent reason or productive end from a business operations standpoint. On or about July 14, 2022, Knoch attributed his behavior to COVID-19 and took approximately 3 weeks of paid time off.

57.    Upon information and belief, during the time that Knoch was taking paid time off to recover from COVID-19, he arranged visits with competitors of Spotter and other potential technology partners for either his own nascent business venture (TKG) or one of Spotter's competitors.

58.    On July 22, 2022, with Knoch's knowledge and consent, John Hunsucker arranged for Knoch to meet with Meloney face-to-face the week of August 1, 2022, but, on information and belief, the meeting was not intended to promote Spotter's business, products or services.

59.    Shortly after the meeting was arranged, Spotter's exploratory relationship with Tarsier/Walaris ceased. On information and belief, Knoch and Meloney developed a plan to promote and sell Tarsier/Walaris without Spotter's involvement and for which Spotter believes they will likely have evidence of given a reasonable opportunity for further investigation and discovery.

60.    Walaris is a direct competitor of Spotter. It uses a device it calls "AirScout," and advertises its services as follows: "We create the situational awareness required to defend your

11

airspace against bad actors. AirScout is utilized to protect sensitive locations across the globe, including bases, borders, government facilities, critical infrastructure, sports stadiums, and more."

61.     In September 2022, John Hunsucker arranged for Knoch Hunsucker, and Rysavy, to meet with Meloney on September 15, 2022 in Georgia in conjunction with their attendance at GSX (a large trade show in Atlanta, Georgia held on September 13 and 14, 2022) or promptly thereafter. Employees at Spotter are generally required to note work-related meetings on Spotter's scheduling system.

62.     The meeting was not within the course and scope of Knoch's, Rysavy's, or Hunsucker's employment with Spotter. Spotter has no record of the meeting on its scheduling system, no notes of the meeting in its files, nor any emails within its email system following up on the meeting. All contact with Meloney within Spotter's email system by Knoch, Rysavy, and Hunsucker ceased after the meeting.

63.     The meeting between Knoch, Rysavy, Hunsucker and Meloney was for the purpose of "moving forward on a potential relationship" with TKG, according to a LinkedIn message between Knoch and Meloney in September 2022.

64.     Further, LinkedIn Messages between the two throughout September 2022 while Knoch was still employed with Spotter stated:

> **Meloney**: "Ed, great to meet yesterday - looking forward to working together. Do you have a company I should name in the MNDA? If not, I can name you personally."
> **Knoch**: "Kyle, The company name is TKG-Security, Edward Knoch. Looking forward to working with you on your solution. I have opportunity and am very excited by your technology. Ed"
> **Meloney**: "Thanks, Ed. I sent over our standard MNDA to you over the weekend. Happy to continue the discussion more deeply once we have that in place. Kyle"
> **Knoch**: "Kyle I signed it yesterday - if you have some time today, I have a partner in Europe that would be very excited to see your demo videos and performance

specifications for an upcoming tender he's working on - do you have sanitized videos that I could share and some performance specs that don't give away any of your 'secret' sauce? Ed".

**Meloney**: "Yes, by 'sanitized', do you mean no Tarsier logo? Does your eknoch@me.com email work best for you?"

**Knoch**: "Best email is my new one - edward.knoch@thekgrp.com. I don't want to expose your product without your permission and if your logo is removed, it would make it easier to show and generate both interest and desire in your product. I am very interested in identifying how this would interface with other systems."

**Knoch**: "I'll ping you at 1pm et."

65.     Given a reasonable opportunity for further investigation and discovery, Spotter believes it will likely have evidence that Knoch began working with Walaris on behalf of TKG prior to ending his employment with Spotter.

66.     Knoch, and his entity TKG, are now, or were, promoting Tarsier/Walaris:



67.     Shortly before resigning, Knoch accessed and downloaded Spotter's highly confidential and sensitive business information, including, among other things, a "Project Design Proposal" expressly stated to be "Confidential and Proprietary." Knoch had no reason related to his work at Spotter to access and download this information yet did so just prior to his resignation and just prior to GSX where he intended to meet with one of Spotter's direct competitors.

13

4863-5079-9755.v2

68.     During the term of Knoch's employment, Knoch's access to Spotter's computers and information contained thereon was limited to and gave no right to Knoch to access the proprietary files of Spotter or download them anywhere. Knoch moved, copied, and deleted numerous proprietary files from his computer to his personal device or a TKG device. Spotter's preliminary investigation shows that proprietary documents were downloaded, moved, and then deleted by Knoch with recovery efforts still ongoing. The files discovered by Spotter to have been downloaded, copied and/or deleted by Knock had economic value given the proprietary nature of the files.

69.     In addition, after Knoch's employment ended, Knoch retained an Amazon Machine Instance (AMI) which contained the entire software components that make up Spotter's NetworkedIO without any authorization from Spotter to take the AMI. Spotter's NetworkedIO also has economic value, at least in part, because the software components are not generally known or easily accessible and were the subject of reasonable security measures. Spotter believes that, given a reasonable opportunity for further investigation and discovery, it will likely find evidence that Knoch misappropriated Spotter's NetworkedIO for his, TKG's, and others' use and benefit without Spotter's authorization nor compensating Spotter for such use.

70.     Spotter believes that, given a reasonable opportunity for further investigation and discovery, it will likely have evidence that Knoch retained (whether virtually or physically) a version of NetworkedIO that he had copied from Spotter's facilities and that Knoch has and is using Spotter's NetworkedIO for his own financial gain. Spotter also believes that, given a reasonable opportunity for further discovery and investigation that Knoch has induced other

4863-5079-9755.v2

individuals or entities to grant him access to NetworkedIO in order for Knoch to copy the same in violation of Spotter's End User License Agreement.

<u>Knoch's Post-resignation Actions</u>

71.    Without authority from Spotter and in violation of his employment agreement with Spotter, on October 7, 2022, via email, Knoch offered to provide Spotter's most expensive and innovative radar to Walaris for integration with Walaris's system.

72.    Knoch unlawfully retained possession of a Spotter demonstration unit/kit or that Knoch induced others to grant him use of a Spotter demonstration kit that would be in violation of an agreement under which the grantor is bound (e.g. End User License Agreement, Employee Agreement, Channel Partner Agreement, etc.).

73.    Knoch has used the kit to expose Spotter's confidential and proprietary software to a competitor of Spotter. Knoch has used the kit to allow others to test against Spotter's products and to access data streams and outputs from Spotter's products thereby exposing Spotter's Intellectual Property to unauthorized third parties without authority and to Spotter's damage.

74.    On November 18, 2022, Knoch offered to leave his "demo kit" with Walaris to allow them to "get tracks sent into the AirScout Verify platform directly from Spotter Software." At that time, Knoch was not employed by Spotter and had not purchased any software from Spotter for his individual use and, if he had, would violate the Spotter's end user license agreement.

75.    Given the opportunity for further discovery and investigation, Spotter believes it will likely have evidence that Gerald Giggs (owner and manager of InterWest Technology Group, Inc., ("InterWest")) invested $250,000 to help Knoch start his own business. InterWest used to be a "Systems Integrator" for Spotter. Knoch had previously served as President of InterWest prior

to his employment with Spotter.

76.     Given the opportunity for further discovery and investigation, Spotter believes it will likely find evidence that Giggs has been involved in the business of TKG since its founding.

77.     Employees of InterWest, including Giggs, compete against Spotter in their capacities as employees of InterWest. InterWest is a competitor of Spotter.

78.     In 2022, Knoch joined, formed, and/or founded The Knoch Group, also known as "TKG Security," and/or "TKG" and, upon resigning from Spotter began working for TKG in a full-time capacity as "President."

79.     Gerald Giggs works for TKG in an official capacity as an employee, contractor and/or director. He is the principal investor in TKG and has served as CEO of TKG.

80.     Knoch believed he was subject to a post-employment non-compete with Spotter and has stated at least three times in writing that he was subject to Spotter's non-compete:

   a.   On November 23, 2022, in an email Knoch wrote, "Gerald [Giggs] will be joining the firm in January 2023 to take over my transactions that may conflict with Spotter. I will be technical support for him while we go through that transition…."

   b.   On November 29, 2022, after trying to sell radars competitive to Spotter to a partner in Turkey, Knoch wrote, "Please remove me from any emails in future as I (personally) am not able to work on any projects vis-à-vis Spotter until such time as I have lapsed my Non-Compete Agreement. Please communicate with Gerald Giggs from The Knoch Group on all future communications. Also, it would be good not to include John [Hunsucker] in our communications as he still works for Spotter and I do not."

4863-5079-9755.v2

    c.   On March 10, 2023 Knoch wrote, "we are under non-compete…." He explained that Giggs was placed in the role of President/CEO of TKG to protect TKG from a threatened lawsuit related to the non-compete and that Knoch would resume the role of President/CEO after the non-compete issue expires or is resolved in court.

81.    Knoch formed TKG to compete against Spotter in the Counter Unmanned Aerial Systems (C-UAS), critical infrastructure and military markets. TKG competes against Spotter in the following ways:

    a.   counter drone and perimeter solutions for critical infrastructure and the military;

    b.   development of a command and control platform;

    c.   perimeter security consulting; and

    d.   specifically tailored engineering solutions related to perimeter security.

82.    TKG markets and sells its products and services in the same primary markets as Spotter such as: electrical power plants and substations, transportation centers, water treatment facilities, prisons, data centers, and oil and gas locations.

83.    TKG designed and sold product integrations that encompass products competitive to Spotter such as: radars, RF detection, video analytics, and track aggregation. TKG Security is a direct competitor to Spotter. In its own words TKG Security specializes in "providing expert consulting on perimeter and aerial protection services." Services offered include "perimeter security assessments, aerial surveillance solutions, and custom security plans tailored to meet the unique needs of each client." TKG Security's stated mission is to "protect and secure the assets of our clients through innovative and reliable aerial and ground protection solutions. We strive to be the industry leader in perimeter security by continuously developing and improving our products

17

and services." TKG Security's stated purpose as a company is: "To be the leading provider of high-quality aerial and ground perimeter security solutions, recognized for our commitment to ethical business practices and exceptional customer service." The verticals where TKG Security is selling its services are: airports, national borders, correctional facilities, critical infrastructure, military and government, mobile deployments, and ports.

84.     In short, TKG Security provides and promotes products and services that compete with Spotter.

85.     Knoch, individually and on behalf of TKG, has promoted events from Spotter's competitors, including Echodyne (a Washington-based entity) and BlackSage, where a competitor's radar was integrated into Spotter's Radar Management System Software, NetworkedIO without authorization from Spotter. Additionally, Knoch individually and on behalf of TKG (whether in person or virtually via means of modern communication) has integrated, or assisted in integrating, competing products into Spotter's NetworkedIO without authorization including but not limited to accessing or using specific knowledge of NetworkedIO's proprietary code and settings not available to the public to develop drivers that configure NetworkedIO to communicate with the foreign device. Knoch and Jon Mandrell ("Mandrell"), are the only individuals not currently employed with Spotter believed to have knowledge sufficient to configure NetworkedIO to integrate a non-Spotter device, with such knowledge obtained by their access to information about Spotter's NetworkedIO that is not readily available to the public and for which Spotter employed reasonable security measures to protect.

4863-5079-9755.v2

86.     Knoch could not have integrated a competing product into Spotter's NetworkedIO software without Spotter's confidential information, including know-how. Spotter has not given Knoch authority to use its confidential information after he left employment or for anyone's benefit other than Spotter.

87.     On October 6, 2022, Knoch disclosed, via email to Walaris, Spotter's confidential data packet format and language to integrate data from other systems describing how Spotter's NetworkedIO works, offering to integrate Walaris' system into Spotter's NetworkedIO, without authorization from Spotter.

88.     Mandrell was employed as Spotter's Software Manager from September 1, 2019 until March 25, 2022. While employed by Spotter, Mandrell was involved in the development and deployment of NetworkedIO.

89.     While employed with Spotter, Mandrell and Knoch both pushed for, and were involved in, Spotter's development of a universal data connection ("UDC") for NetworkedIO. Spotter has yet to release UDC capabilities for NetworkedIO.

90.     On April 27, 2022, Mandrell signed an agreement to work as an independent contractor on Spotter's Software team. *See* **Exhibit C**.

91.     Sections 2 and 3 of the Agreement relate to "Confidential Information" and "Proprietary Information," respectively. In short, among other provisions, Mandrell agreed to: (1) not "improperly use or disclose" confidential or proprietary information (§ 2.3); (2) maintain confidential information "in strict secrecy and confidence" (§ 2.7); and (3) assign all "right, title and interest" in any work product to Spotter (§ 3). *See* Exh. C.

92.     Mandrell continued as an independent contractor performing regular work for Spotter until January 26, 2023 when he verbally stated he wanted to end the independent contractor arrangement with Spotter.

93.     In April 2023, Knoch invited Mandrell to work on a C2 platform that competes with Spotter's NetworkedIO via a GitHub invite to the "ValkyrieC2" organization.

94.     On May 10, 2023, Mandrell sent Spotter's Software Manager a text message terminating his contract with Spotter stating, "Go ahead and close out my contract. I've enjoyed working with you, but I just cannot continue supporting Logan in any way." It was understood that Mandrell was referring to Logan Harris, the founder and President of Spotter. Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Mandrell was upset that Spotter was taking steps to enforce certain clauses of Knoch's employment agreement.

<u>Knoch and Mandrell Collaborate in Knowing Violation of Confidentiality Obligations</u>

95.     On July 10, 2023, Knoch introduced Mandrell to Walaris as TKG's "lead dev on our side." On the same date, Knoch emailed Walaris stating:

   a.   "I'm working on the interfacing of the C2 to Walaris and was wondering if you have any sample code on return data sets when a track is sent into the system and then any returning data on the actively tracked target - it doesn't matter what code base it's in, just so long as it has the JSON and the calls being used on the api to get/set the data. We're almost done with our C2 and this is the last piece we need to have fully vetted."

      i.   Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Defendants used Spotter's API in whole or in part to develop the API for Defendants' C2.

96.     On November 17, 2023, Mandrell and Knoch formed SSI. Knoch serves as the secretary of SSI and Mandrell serves as the president of SSI.  TKG owns 60% of SSI's stock.

97.     On November 27, 2023, SSI, with Knoch as the lead, applied for Trademark protection for "CoreCommand." Knoch's home address which is TKG's business address is stated on the application.

98.     CoreCommand was designed to compete with Spotter and to aid Echodyne a major competitor of Spotter. According to Knoch, "Echodyne's biggest obstacle to market is the fact that they have no C2 (to speak of)."

99.     On November 3, 2022, Knoch claimed that Echodyne "asked me if I would be willing to put together a complete solution (RF/DF, Radar, Optical Tracking and C2)."

100.    Given the opportunity for further investigation and discovery, Spotter will likely have evidence that on or about November 30, 2022 and December 1, 2022, Knoch and Giggs met with representatives of Walaris and Echodyne at The Whitley Hotel in Atlanta, Georgia to discuss, among other things, the creation of a C2 or Security Management System.  John Hunsucker met with Knoch at the Whitley Hotel and it is believed that Hunsucker was present at other meetings, but Hunsucker was not authorized to be in the meetings on behalf of Spotter.  It is believed that Knoch also met with HWPCo and other Spotter business contacts and customers on or about those dates to persuade them to do business with entities other than Spotter.

101.    CoreCommand is competitive with Spotter's NetworkedIO. Given the opportunity for further investigation and discovery, Spotter has evidence that Knoch, retained unauthorized copies of and used Spotter's confidential and proprietary intellectual property including NetworkedIO (as well as other Spotter software and related computer files) to develop CoreCommand and other TKG software products without authorization from Spotter.

4863-5079-9755.v2

102.     Knoch and TKG have used CoreCommand to promote competitors of Spotter and give them access to C2 software that they didn't possess before.

Knoch Solicits Rysavy and Others

103.     Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Knoch and his entity TKG Security have usurped multiple client opportunities, including a potential government contract with the United States Department of Homeland Security in 2023, and an opportunity with Mooring Partners, worth hundreds of thousands of dollars and by using Spotter's confidential information, data and intellectual property without authorization from Spotter.

104.     Knoch and TKG have sought FCC licenses to promote and demonstrate radars competitive to Spotter, including Echodyne, on at least 11 occasions. Some of the known locations are: St. Gabriel, Louisiana (multiple times); Bellevue, Washington; Glendale, Arizona; Conroe, Texas (multiple times); Red Springs, North Carolina; Stow, Ohio (multiple times); Battle Ground, Washington; Alamo, Georgia; Crane, Indiana; and Johnstown, Pennsylvania. Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Knoch used Spotter confidential information, data, know how, and intellectual property when he promoted, integrated, and demonstrated radars and other products competitive to Spotter at Peachtree Corners, Georgia; Atlanta, Georgia; Nashville, Tennessee; and Lake Charles, Louisiana following his resignation from Spotter.

105.     Spotter expends significant time and resources to train new employees due to the technical nature of its business and the products and services it sells.

106.     In an email to Spotter's CEO on November 22, 2022, Knoch stated, "As per the

solicitation of employees – I will not solicit employees. I may talk to former employees as many of them are my friends, but I will not solicit them to work for me."

107.    Despite his promise that he would honor the non-solicitation clause of his Employee Agreement, Knoch did solicit at least two employees to leave Spotter which has damaged Spotter. Spotter had to recruit, hire, train, and/or shift internal resources to cover the departure of the employees.

108.    In or around December 2022, Knoch orchestrated the hiring of the manager of Spotter's Services Department, Rysavy, by InterWest Technology Group, Inc. which is managed and owned by Gerald Giggs who is the principal investor in TKG and was the CEO of TKG when Rysavy began work for InterWest. The arrangement for Rysavy to be hired away from Spotter occurred prior to Rysavy's resignation from Spotter in December 2022. In early January 2023, Rysavy began working for TKG, was given a TKG email account, and was written into TKG's business plan as its Mechanical Engineer.

109.    In or around March 28-31, 2023, at a trade show "ISC West," Knoch approached multiple Spotter employees, inviting them to functions of Echodyne, saying he could help them get job offers from Echodyne, despite promising to honor the non-solicitation clause in his employee agreement in the Fall 2022.

110.    Among other things, Knoch texted a current Spotter employee, Ken Gardner, and asked him if another then-current Spotter employee, Anna Kim, "would … be interested starting as inside sales with a track to becoming outside sales?" Knoch later met up with Ken Gardner and Anna Kim at a bar. Anna Kim left with Knoch to an Echodyne event.

4863-5079-9755.v2

111.    Shortly thereafter, Anna Kim resigned from Spotter and began working for Echodyne, a Spotter competitor promoted by Knoch.

112.    Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Knoch has made written and oral disparaging and derogatory comments about Spotter to encourage the departure of Spotter employees.

113.    On November 17, 2022, in an email to Walaris, Knoch disparaged Spotter stating, "Given the somewhat tenuous nature of the company in Utah, they tend to get very focused on finding conspiracies wherever they can."

114.    Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Knoch soured and helped to sever the economic relationships of Spotter with then-existing partners around the world by his disparagement of Spotter, including but not limited to the reseller ("channel partner") relationship with Securify AB in Sweden and IndustrialEnet. Prior to Knoch's departure, Spotter consistently sold its products/services through both companies. At the time of Knoch's interference, Spotter had a contractual relationship with IndustrialEnet. While Spotter still has an active contractual relationship with IndustrialEnet, economically the relationship is nearly dead and does not generate the income to Spotter as before Knoch's interference.

115.    Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Knoch disparaged Spotter to Tunç Salman by his comments in promoting a competitor's radar over Spotter's. Knoch had Tunç's contact through working for Spotter.

116.    Given the opportunity for further investigation and discovery, Spotter will likely have evidence that TKG took business from Spotter, sometime between his departure from Spotter

24

and August 2023, when Knoch disparaged Spotter's software and services to Entergy. Entergy is a contact that Knoch was privy to through working with Spotter.

117.    Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Knoch and John Hunsucker have disparaged Spotter's products throughout the Middle East and India by trying to convince an important regional partner of Spotter to promote competitors of Spotter.

118.    Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Knoch has disparaged Spotter's products to the South African government to move them from Spotter to Echodyne.

Rysavy's Employment with Spotter

119.    Rysavy interviewed for a position on Knoch's team at Spotter and accepted Spotter's offer of employment on January 8, 2021, by signing Spotter's Offer Letter and signing Spotter's Employee Agreement. The Offer Letter and Employee Agreement were sent by Knoch and signed and returned by Rysavy. Rysavy's first day of employment with Spotter was on or around January 25, 2021. After Rysavy's employment began, he was provided an older form of employment agreement in error that he likewise signed and returned but there was no change in job position, job duties, compensation or other consideration in support of a change to the original employment agreement. *See* **Exhibit D**.

120.    In his Employee Agreement, Rysavy promised to hold Spotter's confidential information "in strictest confidence." *Id*. at § 1(a).

121.    Rysavy also agreed not to compete with Spotter while employed by Spotter, *id*. at § 3.

4863-5079-9755.v2

122.    Knoch was Rysavy's manager from the date of Rysavy's hire to the end of Knoch's employment with Spotter.

123.    Rysavy's starting salary at Spotter was $70,000 a year.

124.    Despite Rysavy's relative inexperience and unfamiliarity with Spotter's products and services, Knoch adjusted Rysavy's salary upward 3 times in his first 9 months with Spotter for a total raise of 42% of his starting salary or $30,000 by September 2021.

125.    Knoch also attempted to increase Rysavy's salary an additional $30,000 in January 2022, but "gate keeping" procedures were set in place to prevent unapproved salary increases and the salary increase request was denied.

126.    At times during his employment, Rysavy had access to CAD files relating to Spotter's hardware and radars. Additionally, during his employment, Rysavy had access to Spotter's NetworkedIO and other software.

127.    Following Knoch's departure, Rysavy assumed roles and responsibilities previously held by Knoch which included oversight of the services and support department and project management of a large utilities project.

128.    Rysavy was present during Knoch's meeting with Meloney at GSX (as stated above) and both Rysavy and Knoch took substantial actions to compete with Spotter by both exploring and planning activities that would be competitive with Spotter and detrimental to Spotter's business prior to their departures from Spotter.

129.    When Rysavy assumed most of Knoch's responsibilities at Spotter, Rysavy was aware that Knoch and TKG were competing with Spotter by selling and promoting competitors of Spotter.

4863-5079-9755.v2

130.    Spotter has evidence that Rysavy assisted or otherwise provided aid and support to Knoch and TKG on a project located in Columbia, South Carolina on or around December 1, 2022.

131.    On or about December 7, 8, and 9, 2022, Rysavy intentionally accessed and downloaded all versions of NetworkedIO from version 4.2 through 5.1. Additionally, he downloaded the NetworkedIO ISO files for creating new NetworkedIO servers. There was no legitimate reason related to Rysavy's work for Spotter at the time for Rysavy to download most of the ISO files as alleged above. Further, the downloaded files included multiple versions of restricted API files for NetworkedIO only available to persons with confidentiality agreements such as Rysavy. Moreover, Rysavy downloaded ".bin" files used for installing and upgrading NetworkedIO, which Rysavy was not engaged in undertaking for Spotter clients at the time he downloaded those files. Rysavy also downloaded the multiple versions of the NetworkedIO Reference Guide in English and Spanish which details how to configure NetworkedIO. The downloading occurred multiple times on December 7, 8, and 9, 2022 to at least 3 different IP addresses. The only files that would have been useful in in the course and scope of his duties at the time that Rysavy acted as alleged above, would have been the latest version of NetworkedIO. At the end of his employment, Rysavy returned his laptop to Spotter with all data files deleted. The current market value of NetworkedIO is $3,600, per virtual machine. The development of NetworkedIO and related software has cost Spotter in excess of $10,000,000.

132.    Rysavy left his employ with Spotter to apparently work for InterWest Technology Group, Inc. but, Rysavy told other people he was going to work as a data analyst for "GM" (presumably General Motors).

27

133.    Rysavy is currently the Utah registered agent for InterWest Technology Group, Inc. Rysavy is also the current registered agent for TKG in Utah.

134.    Rysavy's boss at InterWest Technology Group, Inc., Gerald Giggs, is the principal investor in TKG and has served as the CEO of TKG while employing Rysavy.

135.    By January 17, 2023, at the latest, Rysavy was working for TKG, had been assigned a TKG company email address, and was included in communications with Walaris regarding mechanical engineering issues as well as communications regarding TKG building a C2. By February 6, 2023, Rysavy was also included in the first draft of TKG's business plan as TKG's Mechanical Engineer.

136.    Emails that included Rysavy were at times sent to his TKG email address, and other times to his InterWest email address.

137.    Rysavy provided services to TKG including but not limited to as a contractor mechanical engineer, starting January 2023.

138.    In April 2024, Rysavy was formally hired by TKG as Vice President of Engineering. The official LinkedIn post heralding TKG's hiring of Rysavy stated, "TKG Security is pleased, after many conversations and negotiation, to welcome Merritt Rysavy to the TKG Security team. Merritt will be taking over as VP of Engineering @ TKG Security. We are pleased to have him join our team and look forward to this collaboration. With his wide array of engineering and data skills, Merritt brings a wealth of Mechanical Engineering and rigor practices to TKG Security. Welcome onboard - Merrit!"

139.    Rysavy assisted TKG in the building of CoreCommand.

28

140.    CoreCommand was designed to compete with Spotter and to aid Echodyne, a major competitor of Spotter. According to Knoch, "Echodyne's biggest obstacle to market is the fact that they have no C2 (to speak of)."

141.    On November 3, 2022, Knoch claimed that Echodyne "asked me if I would be willing to put together a complete solution (RF/DF, Radar, Optical Tracking and C2)."

**FIRST CAUSE OF ACTION**
**(Breach of Contract—Knoch)**

142.    Spotter hereby incorporates by this reference each of the foregoing paragraphs as though fully set forth herein.

143.    Spotter and Knoch are (or were at all applicable times) parties to a valid contract, the 2018 employee agreement, Exhibit A, as restated and amended when Knoch accepted Spotter's written offer of a new position and increase in compensation in January 2019, Exhibit B.

144.    Spotter materially performed its obligations under the parties' agreement, by, among other things, paying Knoch for his services.

145.    Knoch, however, breached the terms of agreement by, among other things: misappropriating and/or using confidential, proprietary, and/or intellectual property belonging to Spotter in violation of his confidentiality provision as alleged in paragraphs 67-70 by coordinating, assisting, and generally working with Spotter's direct competitors, such as Walaris and Echodyne while still employed by Spotter and in violation of his confidentiality obligations; siphoning and/or stealing actual, prospective or potential clients of Spotter as alleged in paragraphs 71-87, 103-104, and 112-118, or assisting a direct competitor in doing so; soliciting Spotter employees as alleged in paragraphs 105-111; disparaging Spotter as alleged in paragraphs 112-118; and improperly using and disclosing Spotter's confidential information and trade secrets including Spotter's

Networked IO program, source code and operating manuals.

146.     Spotter has been harmed by Knoch's breaches in an amount to be proven at trial, including attorneys' fees, costs, and interest, totaling not less than $200,000.

**SECOND CAUSE OF ACTION**
**(Breach of the Implied Duty of Good Faith and Fair Dealing—Knoch)**

147.     Spotter hereby incorporates by this reference each of the foregoing paragraphs as though fully set forth herein.

148.     Inherent in all contracts is a duty to act in good faith and fair dealing.

149.     Spotter has materially performed its obligations under its agreement with Knoch.

150.     Knoch has breached the duty of good faith by continuing his employment with Spotter and engaging in conduct that purposefully and intentionally injured Spotter's right to receive the benefits of its agreement with Knoch as alleged herein by taking meetings, engaging in negotiations and other activities for Knoch or TKG's benefit and Spotter's detriment and taking Spotter's confidential information and copying the same on his own personal devices as alleged in paragraphs 55 through 68.

151.     Spotter has been harmed by Knoch's breaches in an amount to be proven at trial, including attorneys' fees, costs, and interest, totaling not less than $200,000.

**THIRD CAUSE OF ACTION**
**(Breach of the Duty of Loyalty - Knoch)**

152.     Spotter hereby incorporates by this reference each of the foregoing paragraphs as though fully set forth herein.

153.     Spotter as a result of its employment of Knoch was owed a fiduciary duty of loyalty by Knoch.

30

154.    Knoch's actions as set forth in paragraphs 53 through 70 during his employment with Spotter violated his common law duty of loyalty to Spotter.

155.    Spotter has been harmed by Knoch's breaches in an amount to be proven at trial, including attorneys' fees, costs, and interest, totaling not less than $200,000.

## FOURTH CAUSE OF ACTION
### (Violation of the Uniform Trade Secrets Act—Knoch and TKG)

156.    Spotter hereby incorporates by this reference each of the foregoing paragraphs as though fully set forth herein.

157.    Spotter has developed protectable trade secrets and confidential information related to its business processes and other aspects of its business, including its NetworkedIO software, as well as other hardware and components.

158.    These trade secrets constitute information, including a formula, pattern, compilation, program, device, method, technique, and/or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

159.    Spotter has taken reasonable steps to preserve the confidential nature of the information and maintain its secrecy, including by requiring those with access to that information, like Knoch, Rysavy, and Mandrell to sign confidentiality agreements.

160.    Knoch, Rysavy, and Mandrell had access to this information by virtue of their prior employment.

161.    TKG and SSI have access to this information via Knoch, Rysavy and Mandrell.

4863-5079-9755.v2

162.    In breach of their duties to Spotter, and without Spotter's knowledge, consent, or authorization, Knoch misappropriated this confidential information to steal Spotter's clients and/or support Spotter's competitors, and to create competing businesses such as TKG Security.

163.    Given the opportunity for further investigation and discovery Spotter will likely have evidence that Knoch provided Spotter's confidential information to TKG for its benefit including for its use in integrating products belonging to Spotter's competitors to Spotter's confidential NetworkedIO software as well as TKG assisting SSI and Securify AB in the development and creation of a competing C2 or Security Management System.

164.    Given the opportunity for further investigation and discovery, Spotter will likely have evidence that TKG knew, or had reason to know, that Knoch acquired Spotter's confidential information through improper means, including through breach of a duty to maintain secrecy.

165.    Given the opportunity for further investigation and discovery, Spotter will likely have evidence that TKG has used Spotter's confidential information for their own benefit and profit.

166.    Spotter has been damaged by these acts in an amount to be determined at trial.

167.    In addition, Spotter is entitled to injunctive relief to prevent further loss or damage to it resulting from Defendants violations of the Uniform Trade Secrets Act, WASH. CODE § 19.108.020.

168.    The misappropriation of Spotter's trade secrets and confidential information was willful and malicious, and Spotter is entitled to recover punitive or exemplary damages and its attorney fees and costs pursuant to WASH. CODE § 19.108.030.

169.    Further, Spotter is entitled to an award of its attorney fees and costs for Defendants'

4863-5079-9755.v2

violation of the Uniform Trade Secrets Act. *See* WASH. CODE § 19.108.040.

## FIFTH CAUSE OF ACTION
### (Intentional Interference with Contractual Relationship—Knoch)

170.     Spotter hereby incorporates by this reference each of the foregoing paragraphs as though fully set forth herein.

171.     Spotter had valid contractual relationships with its employees, such as Anna Kim and Rysavy, and with its distributors, such as IENET, among others.

172.     Knoch knew of these contractual relationships but intentionally interfered with them by improper means and with an improper motive as alleged in paragraphs 112 through 118 as to Knoch, causing the termination of these contracts.

173.     Spotter has been damaged by Knoch's actions in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act of 2016 18 U.S.C. § 1836 *et seq.*—Knoch and TKG)

174.     Spotter hereby incorporates by this reference each of the foregoing paragraphs as though fully set forth herein.

175.     Spotter owns the above-described trade secrets misappropriated by Defendants. These trade secrets are related to Spotter products that are used in, and intended for use in, interstate or foreign commerce.

176.     Defendants misappropriated Spotter's trade secrets at least by acquiring and using those trade secrets with knowledge or reason to know that the trade secrets were acquired by improper means; and by disclosing and using Spotter's trade secrets without the express or implied consent of Spotter (i) after using the improper means described above to obtain such trade secrets; and (ii) with knowledge or reason to know that such trade secrets were (A) acquired under

33

circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets, or (B) derived from or through a person who owed a duty to Spotter to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

177.   Knoch, Rysavy, and Mandrell were under a contractual obligation to Spotter not to use or disclose its confidential or proprietary information, including the trade secrets misappropriated by Knoch, Rysavy, and Mandrell. Knoch's longstanding relationship with Spotter, his clandestine efforts to obtain Spotter's trade secrets, and his subsequent formation of a competing company demonstrate that Knoch was aware he was violating such obligations.

178.   Upon information and belief, TKG knew, or should have known, of Knoch, Rysavy, and Mandrell's duty to maintain the confidentiality of Spotter's information as, among other things, Knoch is the President of TKG and Knoch helped form SSI.

179.   Given the opportunity for further investigation and discovery, Spotter will likely have evidence that Knoch acquired, disclosed, and used Spotter's trade secrets in Washington, including by forming the competing company, or facilitating others to compete or violate their agreements with Spotter.

180.   Spotter takes extensive measures to protect and maintain the secrecy of its trade secrets and confidential and proprietary information. These protections included requiring its employees and contractors to sign confidentiality and non-disclosure agreements, limiting access to its offices, encrypting forms of electronic storage, and limiting access to its computer systems through a variety of security mechanisms, such as requiring a password.

181.   Spotter has expended significant resources to compile its trade secrets and other confidential and proprietary information, which derive independent economic value from not

being publicly available. They are highly valuable to Spotter and potentially to any person or entity that wants to gain a competitive advantage against Spotter in its industry.

182.    As a direct and proximate result of Defendants' misappropriation of Spotter's trade secrets and other confidential and proprietary information, Spotter has suffered and will continue to suffer irreparable harm and other damages, including but not limited to loss of value of its trade secrets. Spotter is therefore entitled to injunctive relief, monetary damages for its actual losses and for unjust enrichment, or a reasonable royalty for Defendants' misappropriation.

183.    Defendants' misappropriation was willful and malicious, justifying an award of double damages and reasonable attorneys' fees and costs to Spotter.

### SEVENTH CAUSE OF ACTION
### (Breach of Contract—Rysavy)

184.    Spotter hereby incorporates by this reference each of the foregoing paragraphs as though fully set forth herein.

185.    Spotter and Rysavy are (or were at all applicable times) parties to a valid contract, the employee agreement, Exhibit D.

186.    Spotter materially performed its obligations under the parties' agreement, by, among other things, paying Rysavy for his services.

187.    Rysavy, however, breached the terms of agreement by, among other things: coordinating, assisting, and generally working with Spotter's direct competitors, such as TKG, and Walaris in violation of the confidentiality, conflicting engagement, and covenant not to compete during the course of employment provisions of the agreement, as alleged in paragraphs 61-62, and 130-139 while still employed by Spotter.

188.    Spotter has been harmed by Rysavy's breaches in an amount to be proven at trial,

4863-5079-9755.v2

including attorneys' fees, costs, and interest, totaling not less than $200,000.

## EIGHTH CAUSE OF ACTION
### (Breach of the Duty of Good Faith and Fair Dealing—Rysavy)

189.    Spotter hereby incorporates by this reference each of the foregoing paragraphs as though fully set forth herein.

190.    Inherent in all contracts is a duty to act in good faith and fair dealing.

191.    Spotter has materially performed its obligations under its agreement with Rysavy.

192.    Rysavy has breached the duty of good faith by continuing his employment with Spotter and engaging in conduct that purposefully and intentionally injured Spotter's right to receive the benefits of its agreement with Rysavy, while Rysavy was still employed at Spotter, as alleged in paragraphs 61-62 and 130-139.

193.    Spotter has been harmed by Rysavy's breaches in an amount to be proven at trial, including attorneys' fees, costs, and interest, totaling not less than $200,000.

## NINTH CAUSE OF ACTION
### (Breach of the Duty of Loyalty - Rysavy)

194.    Spotter hereby incorporates by this reference each of the foregoing paragraphs as though fully set forth herein.

195.    As a result of Spotter's employment of Rysavy, Rysavy owed Spotter a common law duty of loyalty.

196.    Rysavy's actions as alleged in paragraphs 61-62 and 130-139 during his employment with Spotter violated his common law duty of loyalty to Spotter.

197.    Spotter has been harmed by Rysavy's breaches in an amount to be proven at trial, including attorneys' fees, costs, and interest, totaling not less than $200,000.

4863-5079-9755.v2

## JURY DEMAND

Spotter hereby demands a trial by jury on all issues triable by jury as permitted by rule or law. Spotter tenders the appropriate fee in connection with this demand.

## PRAYER FOR RELIEF

WHEREFORE, Spotter respectfully prays for judgment against Defendants as follows:

A.      On its First Cause of Action, damages in an amount to be proven at trial, including attorneys' fees, costs, and interest;

B.      On its Second Cause of Action, damages in an amount to be proven at trial, including attorneys' fees, costs, and interest;

C.      On its Third Cause of Action, damages in an amount to be proven at trial, including attorneys' fees, costs, and interest;

D.      On its Fourth Cause of Action, damages in an amount to be proven at trial, including attorneys' fees, costs, and interest, as well as punitive damages;

E.      On its Fifth Cause of Action, damages in an amount to be proven at trial, including attorneys' fees, costs, and interest;

F.      On its Sixth Cause of Action, damages in an amount to be proven at trial, including attorneys' fees, costs, and interest;

G.      On its Seventh Cause of Action, damages in an amount to be proven at trial, including attorneys' fees, costs, and interest;

H.      On its Eighth Cause of Action, damages in an amount to be proven at trial, including attorneys' fees, costs, and interest;

4863-5079-9755.v2

I.      On its Ninth Cause of Action, damages in an amount to be proven at trial, including attorneys' fees, costs, and interest; and

J.      Such further relief as the Court shall deem just and proper.

DATED this 12th Day of June 2025.

*/s/Mark G. Passannante*
Mark G. Passannante, WSB#25680
Of Attorneys for Plaintiff

Service by ecf to Jack Lovejoy, jlovejoy@corrcronin.com on June 12, 2025, with exhibits

*/s/Mark G. Passannante*
Mark G. Passannante, WSB25680
Of Attorneys for Plaintiff

4863-5079-9755.v2